**UNITED STATES DISTRICT COURT FOR THE**
**MIDDLE DISTRICT OF FLORIDA JACKSONVILLE DIVISION**

RIVER CITY EDUCATION ORGANIZATION, INC., a Florida not for profit corporation d/b/a San Jose Academy & San Jose Preparatory High School, PALM BAY EDUCATION GROUP, INC., a Florida not for profit corporation d/b/a Palm Bay Preparatory Academy, and PINELLAS EDUCATION ORGANIZATION, INC., a Florida not for profit corporation d/b/a Enterprise High School Charter School,

      Plaintiffs,

v.

MARCUS MAY, an individual, MARY ELIZABETH (WALKER) MAY, an individual, MARY ELIZABETH (WALKER) MAY, as Trustee of the Morningwood Trust, the MORNINGWOOD TRUST, a Florida Trust, STEVEN KUNKEMOELLER, an individual, SUSAN M. KUNKEMOELLER, an individual, SUSAN M. KUNKEMOELLER, as Trustee of the Susan M. Kunkemoeller Trust, the SUSAN M. KUNKEMOELLER TRUST, an Ohio Trust, NEWPOINT EDUCATION PARTNERS, LLC, a Florida limited liability company, MIDWEST EDUCATION PARTNERS, LLC, a Florida limited liability company, SCHOOL WAREHOUSE, INC., a Florida corporation, REARDEN CAPITAL, LLC, a Florida limited liability company, SOLO PRODUCTS, INC., an Ohio corporation, MEADOW SPUR, LLC, an Ohio Limited Liability Company, RED IGNITION, LLC, a Nevada corporation, 4855 MAIN ST. PROP., LLC, a Florida limited liability company, CROSSBURN PROPERTIES, LLC, a Florida limited liability company, MARKET CANTON, LLC, an Ohio limited liability company, BLUE VICTORIAN PROPERTY, LLC, a Florida limited liability company, 840 W. STATE ST., LLC, a Florida limited liability company, LEEKCA PROPERTIES, LLC, a

Case No.:

Florida limited liability company, GALT SOLUTIONS, LLC, a Florida limited liability company, ROOSEVELT PROPERTY, LLC, a Florida limited liability company, 5806 BROADWAY PROPERTIES, LLC, a Florida limited liability company, LEASING CO FLORIDA, LLC, a Florida limited liability company, SR 370 VENTURE, LLC, a Florida limited liability company, GULFSTREAM, LLC, a limited liability company, D'ANCONIA DEVELOPMENT, 4877 PEARL PROPERTY, LLC, a Florida limited liability company, and JOHN DOES 1-10.

        Defendants.

_____/

## COMPLAINT

Plaintiffs RIVER CITY EDUCATION ORGANIZATION, INC., a Florida not for profit corporation d/b/a San Jose Academy & San Jose Preparatory High School, PALM EDUCATION GROUP, INC., a Florida not for profit corporation d/b/a Palm Bay Preparatory Academy, and PINELLAS EDUCATION ORGANIZATION, INC., a Florida not for profit corporation d/b/a Enterprise High School Charter School (collectively, "**Plaintiffs**"), by and through their undersigned counsel, hereby complain against the above-named Defendants and allege as follows:

## INTRODUCTION

1.     This Complaint asserts violations of the federal Racketeer Influenced and Corrupt Organizations Act ("**RICO**"), Florida Civil Remedies for Criminal Practices Act ("**Florida RICO**"), and other related state law claims against members and affiliates of the "**May Enterprise**," an association-in-fact enterprise comprised of individuals and entities led by Marcus May, an individual previously engaged in the business of starting and managing

2

public charter schools who was recently convicted criminally in Escambia County, Florida, of perpetrating an expansive fraudulent scheme on charter schools, including Plaintiffs.

2. The May Enterprise, masterminded and led by Marcus May ("*May*"), incudes: (a) May; (b) Steven Kunkemoeller, May's business partner; (c) Mary Elizabeth (Walker) May (hereinafter, "*Mary May*"), the former wife of Marcus May;[1] (d) Susan M. Kunkemoeller, Steven Kunkemoeller's wife; (e) Solo Products, Inc., an Ohio corporation directed and controlled by Kunkemoeller; (f) Newpoint Education Partners, LLC, a Florida limited liability company directed and controlled by May; (g) School Warehouse, Inc., a Florida corporation directed and controlled by Kunkemoeller; (h) Red Ignition, LLC, a Nevada limited liability company directed and controlled by May and Mary May; (i) D.S.D. Group, Ltd., an Ohio limited liability company directed and controlled by Kunkemoeller; (j) Rearden Capital, LLC, a Florida not for profit corporation directed and controlled by May and Mary May; and (k) other entities related to the Mays and Kunkemoellers. These individuals collectively are referred to hereinafter as the "*RICO Defendants*."

3. For more than seven years, the May Enterprise defrauded numerous individuals, entities, and public agencies out of millions of dollars' worth of cash and other property. Plaintiffs are merely several of the many victims of the May Enterprise's racketeering activities, which spanned numerous years and included fraudulent activity in at least two states (Florida and Ohio).

4. Specifically, from approximately 2009 to 2016 (and in many respects continuing to the present), the RICO Defendants have sought for financial gain and other

---

[1] Marry and May finalized a sham divorced on July 13, 2017.

reasons to defraud and otherwise injure Plaintiffs and others by means of a series of schemes and artifices they contrived and executed through a pattern of racketeering activity.

5.     Through the commission of a variety of criminal acts, the May Enterprise has illegally divested and deprived Plaintiffs of their property—causing them extensive harm. These criminal acts were willful and intended to defraud Plaintiffs of substantial sums of money, while bestowing ill-gotten monetary and other benefits on the May Enterprise and its various members.

6.     The RICO Defendants' criminal behavior constitutes predicate acts under federal and state racketeering statutes.  As described in more detail below, members of the May Enterprise were convicted criminally of the following:

- **Racketeering:**  Members of the May Enterprise unlawfully conducted or participated in racketeering activity.

- **Organized Fraud:**  Members of the May Enterprise engaged in organized fraud with an aggregate value of the property obtained more than $50,000.

7.     The egregious misconduct of the RICO Defendants entitles Plaintiffs to the recovery of damages, including, but not limited to, compensatory and treble damages for: (a) the value of the assets illegally and wrongfully taken from Plaintiffs through the RICO Defendants' crimes and illegal activities; (b) attorneys' fees, expenses, and other damages incurred by Plaintiffs due to the RICO Defendants' misconduct; (c) equitable and injunctive relief; (d) punitive damages; and (e) other general damages caused by the RICO Defendants.

8.     Plaintiffs also assert state-law claims against the RICO Defendants and the Affiliate Defendants (defined below) (collectively, the "***Defendants***") for, *inter alia*, violation

of Florida RICO, breach of contract, breach of fiduciary duty, fraud, and unjust enrichment, which all arise out of the Defendants' wrongful and illegal conduct.

## PARTIES AND RELEVANT NON-PARTIES

### *Plaintiffs*

9.      Plaintiff River City Education Organization, Inc. ("***River City Education***"), is a Florida not for profit corporation that at all times relevant to this litigation has operated and continues to operate two charter schools in Duval County, Florida, known as San Jose Academy and San Jose Preparatory High School.  River City Education suffered substantial losses due to the May Enterprise's fraudulent conduct.

10.     Plaintiff Palm Bay Education Group, Inc., d/b/a Palm Bay Preparatory Academy ("***Palm Bay Education***"), is a Florida not for profit corporation that operates a charter school in Bay County, Florida, known as Palm Bay Preparatory Academy.  Prior to 2015, Palm Bay Preparatory Academy was two separate charter schools, one serving students in grades 6 through 8 with the other serving students in grades 9 through 12.  In 2015, these two charter schools were consolidated into the Palm Bay Preparatory Academy.  Palm Bay Education, as the parent corporation, suffered substantial losses due to the May Enterprise's fraudulent conduct.

11.     Plaintiff Pinellas Education Organization, Inc. ("***Enterprise High School***"), is a Florida not for profit corporation that at all times relevant to this litigation has operated and continues to operate a charter school in Pinellas County, Florida, known as Enterprise High School Charter School.  Enterprise High School suffered substantial losses due to the May Enterprise's fraudulent conduct.

*RICO Defendants*

12.     The RICO Defendants identified below are individuals and entities that have conspired to conduct the affairs, directly and indirectly, of the May Enterprise through a pattern of racketeering activity.   Each of the RICO Defendants has committed criminal acts in furtherance of defrauding the Plaintiffs of substantial sums of money, and each has participated in the operation and management of the May Enterprise.   As noted above, these Defendants are referred to collectively herein as the "***RICO Defendants***."

13.     Defendant May is an individual currently incarcerated in the Florida prison system.   May is the person primarily responsible for originating, assembling, and leading the May Enterprise.   May directed and controlled Newpoint Education Partners, LLC, which managed the victim charter schools in this case.   May engaged in egregious and fraudulent self-dealing with the victim charter schools and attempted to conceal his conduct by creating various shell companies and recruiting other individuals to participate in the May Enterprise.

14.     On October 4, 2018, May was convicted on two counts of Racketeering and one count of First-Degree Organized Fraud in case number 2017-CF-3312-A in Escambia County, Florida (the "***May Criminal Case***"), in connection with the same conduct serving as the basis for this action.   Plaintiffs were victims in that case.   A true and correct copy of the Judgment in the May Criminal Case is attached hereto as **Exhibit "1."**

15.     Defendant Steven Kunkemoeller ("***Kunkemoeller***") was a business associate of May and directly benefitted from and assisted May in carrying out the illegal scheme to defraud Plaintiffs.   Kunkemoeller played a key role in the May Enterprise by creating shell companies that directly participated in the May Enterprise Scheme.   On March 16, 2018, Kunkemoeller was convicted of Racketeering and First-Degree Organized Fraud in case number 2017-CF-

3312-B in Escambia County, Florida (the "***Kunkemoeller Criminal Case***"), in connection with the same conduct serving as the basis for this action.  Plaintiffs were victims in that case.  A true and correct copy of the Judgment in the Kunkemoeller Criminal Case is attached hereto as **Exhibit "2."**

16. Defendant Mary Elizabeth (Walker) May ("***Mary May***") is May's ex-wife. Mary May directly benefitted from and assisted May in carrying out the illegal scheme to defraud Plaintiffs.  Mary May, in both her individual capacity and as Trustee of the Morningwood Trust, played a key role in the May Enterprise by creating shell companies that directly participated in the May Enterprise Scheme (described more fully below).  In an effort to conceal and impede the ability of victims of the May Enterprise Scheme to recover funds from which they were defrauded, Mary May and May agreed to a sham divorce, whereupon Mary May ended up with millions of dollars' worth of ill-gotten cash and other property.  Mary May assisted the May Enterprise in, *inter alia*, the Money Laundering Scheme (described more fully below) and the Real Estate Acquisition Scheme.

17. Defendant Susan M. Kunkemoeller ("***Susan Kunkemoeller***") is Kunkemoeller's wife.  Susan Kunkemoeller, in both her individual capacity and as Trustee of the Susan M. Kunkemoeller Trust, materially assisted and knowingly benefitted from the May Enterprise in carrying out the illegal scheme to defraud Plaintiffs.  In an effort to conceal and impede the ability of victims of the May Enterprise Scheme to recover funds from which they were defrauded, Susan Kunkemoeller played a key role in the May Enterprise by assisting in, *inter alia*, the Money Laundering Scheme (described more fully below) and the Real Estate Acquisition Scheme.

18.     Defendant Midwest Education Partners, LLC d/b/a Cambridge Education Group ("***Cambridge Education Group***"), is a Florida limited liability company that was directed and controlled by May.   Under the direction of May, Cambridge Education Group used other entities, such as Newpoint Education Partners, as instrumentalities by which to take control of the finances of the victim charter schools and conduct the affairs of the May Enterprise Scheme perpetrated by the May Enterprise.

19.     Defendant Newpoint Education Partners, LLC ("***Newpoint Education Partners***"), was a Florida limited liability company directed and controlled by May and Cambridge Education Group.  While technically a separate legal entity, Newpoint Education Partners was in fact an alter ego of Cambridge Education Group and was used as an instrumentality by Cambridge Education Group, under the direction and control of May, to perpetrate the May Enterprise Scheme.  Under the direction of May, Newpoint Education Partners contracted with each of the victim charter schools to provide management services, took control of their finances, and abused this fiduciary relationship to perpetrate the May Enterprise Scheme.

20.     Defendant School Warehouse, Inc. ("***School Warehouse***"), is a Florida corporation directed and controlled by Kunkemoeller.  School Warehouse participated in the May Enterprise's illegal acts and received funds fraudulently obtained from the Plaintiffs. Kunkemoeller created School Warehouse with the specific intent for it to serve as a shell company and conduit for the Fraudulent Invoicing Scheme and Money Laundering Scheme (defined below) that the May Enterprise perpetrated against the victim charter schools.

21.     Defendant Red Ignition, LLC ("***Red Ignition, LLC***"), is a Nevada limited liability company directed and controlled by May.  Red Ignition, LLC, participated in the RICO

Defendants' illegal acts and received funds fraudulently obtained from the Plaintiffs.  May created Red Ignition, LLC, with the specific intent for it to serve as a shell company and conduit for the Fraudulent Invoicing Scheme that he perpetrated on the victim charter schools.  May later sold Red Ignition, LLC, to Kunkemoeller for $100,000, despite Red Ignition, LLC, having no assets, no liabilities, and no employees.

22.     Rearden Capital, LLC ("***Rearden Capital***"), is a Florida limited liability company that was directed and controlled by May and Mary May.  Mary May is listed as Rearden Capital's manager and registered agent on the Florida Department of State, Division of Corporation's online database.  On multiple occasions, Rearden Capital participated in the Money Laundering Scheme, Fraudulent Apex Rebate Scheme, and Real Estate Acquisition Scheme perpetrated by the May Enterprise.  Rearden Capital owns, *inter alia*, 1500 Superior Rd., Canton, Ohio 44705, and 251 Schocalog Rd., Akron, Ohio 44313.

23.     Solo Products, Inc. ("***Solo Products***"), is an Ohio corporation that was directed and controlled by Kunkemoeller.  Kunkemoeller is listed as Solo Products' incorporator and registered agent on the Ohio Secretary of State's online database.  Solo Products participated in, *inter alia*, the Fraudulent Invoicing Scheme and Money Laundering Scheme perpetrated by the May Enterprise.

24.     D.S.D. Group, Ltd. d/b/a Direct Store Delivery ("***Direct Store Delivery***") is an Ohio limited liability company that was directed and controlled by Kunkemoeller.  Direct Store Delivery's operating agreement shows Kunkemoeller as having a 100% ownership interest in the company.  Direct Store Delivery participated in the Fraudulent Invoicing Scheme and Money Laundering Scheme perpetrated by the May Enterprise.

*Affiliate Defendants*

25.     The Affiliate Defendants identified below are individuals and entities that the RICO Defendants utilized as shell entities to receive and hold the May Enterprise's ill-gotten proceeds in furtherance of defrauding the Plaintiffs.   These Defendants are referred to collectively herein as the "*Affiliate Defendants*."

26.     The Susan M. Kunkemoeller Trust ("*Kunkemoeller Trust*"), is an Ohio trust directed and controlled by Susan Kunkemoeller, as Trustee.   The Kunkemoeller Trust participated in, and was unjustly enriched by, the Money Laundering Scheme and the Real Estate Acquisition Scheme perpetrated by the May Enterprise.

27.     The Morningwood Trust ("*Morningwood Trust*") is a Florida Trust.   Upon information and belief, Mary May is the Trustee of the Morningwood Trust, which participated in, and was unjustly enriched by, the Money Laundering Scheme and the Real Estate Acquisition Scheme perpetrated by the May Enterprise.

28.     Leekca Properties, LLC, ("*Leekca Properties*"), is a Florida limited liability company that was directed and controlled by May and Mary May.   Mary (Walker) May is listed as Leekca Properties' manager and registered agent on the Florida Department of State, Division of Corporation's online database.   Leekca Properties participated in, and was unjustly enriched by, the Money Laundering Scheme and the Real Estate Acquisition Scheme perpetrated by the May Enterprise.

29.     5806 Broadway Properties, LLC, ("*Broadway Properties*"), is a Florida limited liability company that was directed and controlled by May and Mary May.   Mary (Walker) May is listed as Broadway Properties' manager and registered agent on the Florida Department of State, Division of Corporation's online database.   Broadway Properties participated in, and

10

was unjustly enriched by, the Money Laundering Scheme and the Real Estate Acquisition Scheme perpetrated by the May Enterprise.

30.     Galt Solutions, LLC ("*Galt Solutions*"), is a Florida limited liability company that was directed and controlled by May and Mary May.  Mary (Walker) May is listed as Galt Solution's manager and registered agent on the Florida Department of State, Division of Corporation's online database.  Galt Solutions participated in, and was unjustly enriched by, the Money Laundering Scheme and the Real Estate Acquisition Scheme perpetrated by the May Enterprise.

31.     Roosevelt Property, LLC ("*Roosevelt Property*"), is a Florida limited liability company, doing business in Ohio, that was directed and controlled by May and Mary May. Roosevelt Property participated in, and was unjustly enriched by, *inter alia*, the Money Laundering Scheme and the Real Estate Acquisition Scheme perpetrated by the May Enterprise.

32.     840 W. State St., LLC ("*840 W. State St.*"), is a Florida limited liability company that was directed and controlled by May and Mary May.  Mary (Walker) May is listed as 840 W. State St.'s registered agent on the Florida Department of State, Division of Corporation's online database.  May is listed as its manager.  840 W. State St. participated in, and was unjustly enriched by, the Money Laundering Scheme and the Real Estate Acquisition Scheme perpetrated by the May Enterprise.

33.     Blue Victorian Property, LLC ("*Blue Victorian Property*"), is a Florida limited liability company that was directed and controlled by May and Mary May.  Mary (Walker) May is listed as Blue Victorian Property's registered agent on the Florida Department of State, Division of Corporation's online database.  May is listed as its manager.  Blue Victorian

Property participated in, and was unjustly enriched by, the Money Laundering Scheme and the Real Estate Acquisition Scheme perpetrated by the May Enterprise.

34. Crossburn Properties, LLC ("***Crossburn Properties***"), is a Florida limited liability company that, upon information and belief, was directed and controlled by May, Mary May and/or Kunkemoeller. Crossburn Properties participated in, and was unjustly enriched by, the Money Laundering Scheme and the Real Estate Acquisition Scheme perpetrated by the May Enterprise.

35. 4855 Main St. Prop., LLC ("***Main Street Properties***"), is a Florida limited liability company that was directed and controlled by May and Mary May. Marcus May is listed as Main Street Properties' manager and registered agent on the Florida Department of State, Division of Corporation's online database. Main Street Properties participated in, and was unjustly enriched by, the Money Laundering Scheme and the Real Estate Acquisition Scheme perpetrated by the May Enterprise.

36. Market Canton, LLC ("***Market Canton***"), is an Ohio limited liability company that, upon information and belief, was directed and controlled by May, Mary May and/or Kunkemoeller. Market Canton participated in, and was unjustly enriched by, the Money Laundering Scheme and the Real Estate Acquisition Scheme perpetrated by the May Enterprise.

37. Meadow Spur, LLC ("***Meadow Spur***"), is an Ohio limited liability company that, upon information and belief, is directed and controlled by May and Mary May. Meadow Spur participated in, and was unjustly enriched by, the Money Laundering Scheme and the Real Estate Acquisition Scheme perpetrated by the May Enterprise. Meadow Spur owns the real property located at 1133 Meadow Spur, Akron, Ohio 44333.

38.     Leasing Co Florida, LLC ("***Leasing Co***"), is a Florida limited liability company that, upon information and belief, is directed and controlled by May and Mary May.  Leasing Co participated in, and was unjustly enriched by, the Money Laundering Scheme and the Real Estate Acquisition Scheme perpetrated by the May Enterprise.  Leasing Co owns the real property located at 13334 Torresina Terrace, Bradenton, Florida 34211.

39.     SR 370 Venture, LLC ("***SR 370 Venture***"), is a Florida limited liability company that, upon information and belief, is directed and controlled by May and Mary May.  SR 370 Venture participated in, and was unjustly enriched by, the Money Laundering Scheme and the Real Estate Acquisition Scheme perpetrated by the May Enterprise.

40.     Gulfstream, LLC ("***Gulfstream***"), is a limited liability company that, upon information and belief, is directed and controlled by May and Mary May.  Gulfstream participated in, and was unjustly enriched by, the Money Laundering Scheme and the Real Estate Acquisition Scheme perpetrated by the May Enterprise.

41.     D'Anconia Development ("***D'Anconia Development***") is an entity that, upon information and belief, is directed and controlled by May and Mary May.  D'Anconia Development participated in, and was unjustly enriched by, the Money Laundering Scheme and the Real Estate Acquisition Scheme perpetrated by the May Enterprise.

42.     4877 Pearl Property, LLC ("***Pearl Property***"), is a Florida limited liability company that is directed and controlled by Mary May.  Mary May is listed as Main Street Properties' manager and registered agent on the Florida Department of State, Division of Corporation's online database.  Pearl Property participated in, and was unjustly enriched by, the Money Laundering Scheme and the Real Estate Acquisition Scheme perpetrated by the May Enterprise.

***John Does 1-10 and Non-Party RICO Co-Conspirators***

43.     Certain other non-party individuals may have played key roles, directly or indirectly, in the May Enterprise's efforts to defraud Plaintiffs, including the RICO Defendants' confederates not named in this Complaint and other individuals who have not yet been identified.  Plaintiffs reserve their right to name such entities or individuals as Defendants should their involvement with the May Enterprise be discovered through litigation.

## JURISDICTION AND VENUE

44.     This Court has subject-matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because: (a) some of the claims in this action arise under the Racketeer Influenced and Corrupt Organizations ("***RICO***") Act, 18 U.S.C. §§ 1961-1968; and (b) the remaining claims are so related to the claims within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

45.     This Court has personal jurisdiction over Defendants pursuant to: (a) 18 U.S.C. § 1965; and (b) Florida's long-arm statute, section 48.193, Florida Statutes.

46.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the actions and events giving rise to this action occurred within this judicial district and division.

## GENERAL ALLEGATIONS

### I.     *Background on Florida Charter Schools*

47.     Charter schools in Florida are public schools.  Fla. Stat. § 1002.33(1).  Just like traditional public schools, charter schools are publicly funded, tuition-free, and open to all members of the public.  Fla. Stat. § 1002.33.  However, unlike their district school counterparts,

the operations of a charter school are not managed by the locally elected school board, but rather by an independent governing board of the charter school.  Fla. Stat. § 1002.33(9).  All governing board members are unpaid and serve as volunteers.

48.     Charter schools in Florida are governed by section 1002.33, Florida Statutes (the "***Charter Statute***"), which "is comprehensive in its treatment of all aspects of the creation, operation, and termination of charter schools."  *School Bd. of Miami-Dade Cnty. v. Survivors Charter Schools, Inc.*, 3 So.3d 1220, 1229 (Fla. 2009).  The Charter Statute requires that charter schools, among other things, be nonsectarian and comply with the requirements of the Public Records Act.  Charter school governing boards are also required to hold meetings open to the public in compliance with Florida's Sunshine Law.  Fla. Stat. §§ 286.011, 1002.33(16).

49.     While the operations of charter schools are managed by an independent governing board, charter schools still maintain a close relationship with the school district within which they operate.  Fla. Stat. § 1002.33(5).  Any person or entity wishing to open a charter school within a school district must first submit an application to the school board.  Fla. Stat. § 1002.33(3).  The school board then reviews the application using an evaluation instrument developed by the Florida Department of Education.  Fla. Stat. § 1002.33(6)(b).  The school board may then approve or deny the application by a majority vote.  *Id.*

50.     Once the application is approved, the school board takes on the role of being the sponsor for the charter school.  Fla. Stat. § 1002.33(5).  The sponsoring school board is required to enter into a charter contract with the charter school, setting forth the terms and conditions under which the charter school will operate.  Fla. Stat. § 1002.33(7).  Once a charter contract is executed, the sponsor assumes a supervisory role over the charter school, ensuring that the school follows all applicable laws, complies with the terms of the charter contract, and

makes adequate progress towards the educational goals established in the charter contract.  Fla. Stat. § 1002.33(5).  Relevant to this litigation, the sponsor also serves as an intermediary for nearly all public funds flowing to the charter school, ensuring the charter school uses the funds properly and follows generally accepted standards of fiscal management.  *Id.*

51.     Charter schools receive funding from local, state, and federal sources.  Fla. Stat. § 1002.33(17)(b).  The primary source of funding for charter schools is through the Florida Education Finance Program ("***FEFP***").  The FEFP consists of revenues generated from certain local taxes levied by school boards, as well as state FEFP funds appropriated by the Florida Legislature.  Fla. Stat. §§ 1011.71, 1011.62.  Charter schools receive FEFP funds based on the number of full-time equivalent students enrolled at the school.  Fla. Stat. § 1002.33(17).  This means that the more students that are enrolled at a school, the more funding a school will receive.  Charter schools also receive funding from a number of other sources, including, *inter alia*, state appropriated Public Educational Capital Outlay ("***PECO***") funds, discretionary local millage levies, and funding from federal sources.  Fla. Stat. §§ 1002.33(17) and 1011.71(1), (2) and (9).

52.     Defendants fraudulently deprived the Plaintiffs (and their respective students) of state and federal funds that they were entitled to receive.  This was accomplished through a series of schemes and artifices, each with the common goal of fraudulently depriving victim charter schools of substantial sums of money and providing kickback payments to the RICO Defendants and others involved in the schemes (hereinafter collectively referred to as the, "***May Enterprise Scheme***").  The individual fraudulent schemes and artifices that comprise the May Enterprise Scheme can roughly be defined as the following, each of which is described in

more detail below:

- **Scheme 1**: Fraudulent Invoicing Scheme;

- **Scheme 2**:  Fraudulent Charter School Program ("***CSP***") Reimbursement Scheme;

- **Scheme 3:**  Fraudulent Apex Rebate Scheme;

- **Scheme 4**:  Money Laundering Scheme;

- **Scheme 5:**  Fraudulent Broker Fees/Lease Commission Scheme;

- **Scheme 6**:  Fraudulent Student Lunch Proceeds Scheme; and

- **Scheme 7**:  Real Estate Acquisition Scheme.

## II.     *The May Enterprise Perpetrated the May Enterprise Scheme Against the Plaintiff Charter Schools.*

53.     In 2007, May formed Newpoint Education Partners to manage charter schools across the State of Florida.  Newpoint Education Partners served as an instrumentality of May and Cambridge Education Group.  Through Newpoint Education Partners, May and Cambridge Education Group assisted charter schools in developing applications to submit to school boards and advise them throughout the approval process.  In this regard, May filed the necessary paperwork to form the not for profit entities that operated the charter schools.  May also played a key role in forming the governing boards that oversaw the operations of each school, often filling them with his friends or colleagues.

54.     Each of the charter schools, under May's direction, entered into a management agreement with Newpoint Education Partners.  These management agreements are expansive in their breadth and gave Newport Education Partners control of practically every operational facet of the charter schools.  Specifically, Newpoint Education Partners negotiated leases for

the schools, selected bookkeepers and other professionals for the schools, opened bank accounts for each school, and, relevant to this litigation, purchased equipment, education materials, furniture, and supplies for each school.

55.     Newpoint Education Partners ultimately managed fourteen (14) charter schools across the State of Florida, including schools in Duval County, Bay County, Broward County, Escambia County, Hillsborough County, and Pinellas County.  May was involved in all aspects of the development of these charter schools, from their conception, formation, during their operations, and, in the case of many of these schools, until they were forced to close due to the criminal actions of the May Enterprise.

56.     Plaintiffs in this case are certain charter schools that individually contracted with Newpoint Education Partners for management and related services through various management agreements (collectively, the "***Management Agreements***"), as described below.

- Enterprise High School entered into a management agreement with Newpoint Education Partners on or about April 5, 2011, attached hereto **Exhibit "3."**

- River City Education entered into a management agreement with Newpoint Education Partners on or about July 25, 2013, attached hereto as **Exhibit "4."**

- Palm Bay Education entered into a management agreement with Newpoint Education Partners on or about January 23, 2008, attached hereto as **Exhibit "5."**

57.     May also contrived to take full control of each charter school's finances.  To do this, May did not allow the governing board members of the charter schools to have access to

18

their school's bank accounts or to make withdrawals.  This meant that the governing boards at each school were intentionally hamstrung in their ability to monitor the finances of their respective schools.  The financial oversight each board exercised was generally to review financial statements prepared by bookkeepers that were handpicked by May.  With May's intentional limited oversight from these charter school governing boards, Defendants were generally free to undertake their fraudulent financial transactions without much scrutiny.

58.     Newpoint Education Partners further took a management fee of 18% of qualified revenues that each of these charter schools brought in, a fee that is on the high end of what most management companies in Florida charge.  Nevertheless, May was not satisfied charging such a high fee.  May also ensured that the vendors he selected to supply the charter schools with furniture, education materials, supplies, and equipment were his own shell companies, or shell companies that his confederates and affiliated entities owned and controlled.  At the direction of May, the charter schools, managed by Newpoint Education Partners, would provide hundreds of thousands of dollars per year to one or more of May's controlled entities for the purpose of purchasing needed furniture, computers, supplies and other inventory.

59.     When May opened the first of several charter schools in Florida, all which were managed by Newpoint Education Partners, he used his own company, Red Ignition, LLC, as the primary source from which all purchases of furniture, supplies, and equipment were made for the charter schools.  May made massive illicit profits by purchasing merchandise from vendors and reselling them to Newpoint Education Partners-managed charter schools at substantially marked-up rates.  May never disclosed this clear conflict of interest to the charter schools, but instead concealed and misrepresented his relationship with Red Ignition, LLC, and

other affiliated entities.

60.     In almost every facet of business related to the Newpoint Education Partners-managed charter schools, May directed the May Enterprise to engage in conduct aimed at defrauding the charter schools and enriching himself and other members of the May Enterprise.

61.     The May Enterprise Scheme involved multiple components, including, but not limited to, (i) the Fraudulent Invoicing Scheme; (ii) Fraudulent CSP Reimbursement Scheme; (iii) the Fraudulent Apex Rebate Scheme; (iv) the Money Laundering Scheme; (v) the Fraudulent Broker Fees/Lease Commission Scheme; (vi) the Fraudulent Student Lunch Proceeds Scheme; and (vii) the Real Estate Acquisition Scheme.  Each of these facets of the May Enterprise Scheme had the common goal of defrauding Newpoint Education Partners-managed charter schools, including the Plaintiffs, of substantial sums of money, enriching Defendants and others, and concealing these activities.

62.     The May Enterprise perpetuated the May Enterprise Scheme until many of the charter schools were forced to close.

### III.    Members of the May Enterprise are Convicted Criminally in Connection with the May Enterprise Scheme.

63.     Eventually, auditors became aware of certain irregularities between Newpoint Education Partners-managed charter schools.  *See* Affidavit of Escambia County, Florida, auditor, David Bryant, attached hereto as **Exhibit "6."**  For instance, property was found at some Newpoint Education Partners-managed charter schools that belonged to schools in entirely different school districts.  There were also orders placed by Newpoint Education Partners on behalf of charter schools that were paid for from the charter schools' accounts, but never actually delivered.  Many of the charter schools also had a surprising lack of furniture,

education materials, supplies, and equipment that did not seem to align with the levels of funding the schools were receiving or the monies they had paid to acquire such items.

64.     The auditors also discovered that a substantial number of purchases from the Newpoint Education Partners-related charter schools were filled by only a few vendors that were all related to the May Enterprise.  Neither May nor Kunkemoeller disclosed to the charter schools their relationship to the vendor entities.

65.     Based in part on the auditors' findings, in June 2017, May and Kunkemoeller were arrested for racketeering in violation of section 895.03, Florida Statutes, and for fraudulently obtaining property over $50,000 in value, in violation of section 817.034, Florida Statutes, in connection with the May Enterprise Scheme.

66.     On May 18, 2018, Kunkemoeller was adjudicated guilty of one count of racketeering in violation of section 895.03, Florida Statutes, and one count of fraudulently obtaining property over $50,000, in violation of section 817.034, Florida Statutes.  *See* Ex. 2.

67.     On November 13, 2018, May was adjudicated guilty on two counts of racketeering in violation of section 895.03, Florida Statutes, and one count of fraudulently obtaining property over $50,000 in value, in violation of section 817.034, Florida Statutes.  *See* Ex. 1.

68.     The convictions of May and Kunkemoeller were directly related to the May Enterprise Scheme described herein.

   **A.  Scheme 1: Fraudulent Invoicing Scheme**

69.     From at least 2009 to 2016, the May Enterprise engaged in a systematic Fraudulent Invoicing Scheme perpetrated on the Plaintiffs with the goal of depriving them of substantial sums of money and enriching members of the May Enterprise at the expense of

Plaintiffs and their students.

70.     Newpoint Education Partners quickly expanded throughout Florida.    As operations expanded, May approached Kunkemoeller (a longtime friend of May's) with a plan to defraud Newpoint Education Partners-managed charter schools in a manner that would conceal May's conflicts of interest and egregious self-dealing.   In this regard, May proposed having Kunkemoeller utilize shell business entities to disguise the true owners' identity (*i.e.*, the Mays and Kunkemoellers) to perpetrate a fraud upon the charter schools managed by Newpoint Education Partners.

71.     Kunkemoeller agreed to be involved in this Fraudulent Invoicing Scheme.

72.     The Fraudulent Invoicing Scheme worked as follows: When a charter school needed supplies, May communicated this to Kunkemoeller.   Using one of their shell/conduit companies, Kunkemoeller purchased the supplies directly from a supplier and then resold them to the charter schools at rates well in excess of what Kunkemoeller paid for the supplies.   On numerous occasions, Kunkemoeller received an order request from May on behalf of Newpoint Education Partners-managed charter schools, purchased the supplies from a supplier, and then had the supplier ship the items directly to the charter schools.   May and Kunkemoeller shared in the significant overcharges reaped from this illicit scheme.

73.     Notably, the supplies were neither shipped nor stored by Kunkemoeller's shell companies.    Kunkemoeller's shell companies generally assumed no risk with these transactions.   Specifically, the charter schools made a "down payment" for the order, which one of Kunkemoeller's shell companies utilized to purchase the items to then re-sell to the charter schools at substantially marked up rates.   Further, nearly all of the suppliers would have sold the subject supplies directly to the charter schools themselves.

74.     Kunkemoeller prepared invoices for the supplies with prices marked up sometimes as much as 160 to 300 percent.  Such invoices were sent to School Financial Services, the bookkeeper that was handpicked by May for each school.  The ill-gotten proceeds were then paid to Kunkemoeller with *public funds* from the schools' bank accounts.  Upon being paid, Kunkemoeller shared approximately half of the profits with May as kickbacks.  The staff and governing board members at each charter school never saw these invoices or were involved in the process of purchasing supplies, nor did May or Kunkemoeller ever disclose the relationship between May, Kunkemoeller, School Warehouse, and the other members of the May Enterprise involved in the Fraudulent Invoicing Scheme.  Newpoint Education Partners and the May Enterprise handled or directed all aspects of the purchasing and payment process.

75.     In furtherance of the Fraudulent Invoicing Scheme, Kunkemoeller purchased Red Ignition, LLC–which had no assets or liabilities–from May for $100,000.  He also formed School Warehouse and Red Ignition, Inc., Florida business entities that would serve as the primary conduits for the May Enterprise's Fraudulent Invoicing Scheme going forward.  Like Red Ignition, LLC, these companies were mere shell companies, with no assets, liabilities, or employees.

76.     On various occasions, Solo Products, Newpoint Education Partners, and Cambridge Education Group participated in the Fraudulent Invoicing Scheme by providing School Warehouse with credit or monies to purchase items that were fraudulently sold to the victim charter schools, including the Plaintiffs.

77.     Because of the substantial amount of lost revenue to each charter school, they were often forced to operate with few supplies or classroom materials.  Teachers were forced to teach without textbooks or use substandard computers and classroom technology.  Due to

the Fraudulent Invoicing Scheme, the students at each of the victim charter schools were negatively affected in that their schools were underfunded and ill-equipped to provide the students with an appropriate education to which they are entitled.  Due to the actions of Defendants, many of the charter schools were forced to close.

78.     Specific examples of instances in which this Fraudulent Invoicing Scheme was perpetrated against each of the Plaintiffs are detailed below:

**River City Education**

79.     From at least 2013 to 2016, the May Enterprise perpetrated the Fraudulent Invoicing Scheme against River City Education.  Specific examples of how River City Education was damaged by the Fraudulent Invoice Scheme include, but are not limited to, the following:

*August 2013 – September 2013 Invoices*

80.     On an invoice dated August 29, 2013, School Warehouse billed River City Education $55,195.00 for computer equipment as part of the Fraudulent Invoicing Scheme. School Warehouse purchased the computer equipment from supplier CDW-G at an actual cost of $33,381.38.  The difference in what School Warehouse paid for the computer equipment and what it charged River City Education was $21,813.62, meaning that School Warehouse marked the prices up approximately 65.35%.

81.     On an invoice dated September 3, 2013, School Warehouse billed River City Education $70,450.84 for furniture as part of the Fraudulent Invoicing Scheme.  School Warehouse purchased the furniture from suppliers Hertz Furniture, Discount Office Furniture, and ParkNPool at an actual cost of $40,593.41.  The difference in what School Warehouse paid for the furniture and what it charged River City Education was $29,857.43, meaning that

24

School Warehouse marked the prices up approximately 73.55%.

82.     On or about January 21, 2014, River City Education paid School Warehouse $115,645.84 for the amounts due under the August 29, 2013 and September 3, 2013 invoices, which together totaled $125,645.84.  A $10,000 deposit previously paid by River City Education was applied to cover the remainder of the amounts due under the invoices.

*August 2015 Invoice*

83.     On an invoice dated August 4, 2015, School Warehouse billed River City Education $21,660.09 for furniture as part of the Fraudulent Invoicing Scheme.  School Warehouse purchased the furniture from supplier Florida Office Interiors and Hertz at a cost of $9,327.75.  The difference in what School Warehouse paid for the furniture and what it charged River City Education was $12,332.34, meaning that School Warehouse marked the prices up approximately 132.21%.

84.     On October 19, 2015, River City Education paid School Warehouse $21,660.09 for the amount due under the August 4, 2015 invoice.

85.     Other examples of how River City Education was damaged by the Fraudulent Invoicing Scheme are detailed in the spreadsheet attached hereto as **Exhibit "7."**

**Palm Bay Education**

86.     From at least 2010 to 2014, the May Enterprise perpetrated the Fraudulent Invoicing Scheme against Palm Bay Education.  Specific examples of how Palm Bay Education was damaged by the Fraudulent Invoice Scheme include, but are not limited to, the following:

*June 2010 Invoice*

87.     On an invoice dated June 1, 2010, Red Ignition, LLC, billed Palm Bay Education $120,000 for computer equipment as part of the Fraudulent Invoicing Scheme.  Red

Ignition, LLC, purchased the computer equipment from supplier System 76 at an actual cost of $46,080. The difference in what Red Ignition, LLC, paid for the computer equipment and what it charged Palm Bay Education was $73,920, meaning that Red Ignition, LLC, marked the prices up approximately 160.42%.

88.     On or about June 23, 2010, Palm Bay Academy paid Red Ignition, LLC, $120,000 for the amount due under the June 1, 2010 invoice.

*September 2014 Invoice*

89.     On an invoice dated September 16, 2014, School Warehouse billed Palm Bay Education $5,419.50 for computer equipment and furniture as part of the Fraudulent Invoicing Scheme. School Warehouse purchased the computer equipment and furniture from suppliers Florida Office Interiors and CDW at an actual cost of $2,505.31. The difference in what School Warehouse paid for the computer equipment and what it charged Palm Bay Education was $2,914.19, meaning that School Warehouse marked the prices up approximately 116.32%.

90.     On or about November 21, 2014, Palm Bay Education paid School Warehouse $5,419.50 for the September 16, 2014 invoice.

91.     Exhibit 7 delineates other examples of how Palm Bay Education was damaged by the Fraudulent Invoicing Scheme.

**Enterprise High School**

92.     From at least 2013 to 2015, the May Enterprise perpetrated the Fraudulent Invoicing Scheme against Enterprise High School. Specific examples of how Enterprise High School was damaged by the Fraudulent Invoicing Scheme include, but are not limited to, the following:

*August 2013–September 2013 Invoices*

93.     On an invoice dated August 29, 2013, School Warehouse billed Enterprise High School $27,930.00 for computer equipment as part of the Fraudulent Invoicing Scheme. School Warehouse purchased the computer equipment from supplier CDW at an actual cost of $18,099.31.  The difference in what School Warehouse paid for the computer equipment and what it charged Enterprise High School was $9,830.69, meaning that School Warehouse marked the prices up approximately 54.32%.

94.     On an invoice dated September 3, 2013, School Warehouse billed Enterprise High School $16,741.55 for furniture as part of the Fraudulent Invoicing Scheme.  School Warehouse purchased the furniture from suppliers Hertz and Discount Office Items at an actual cost of $9,926.38.  The difference in what School Warehouse paid for the furniture and what it charged Enterprise High School was $6,815.17, meaning that School Warehouse marked the prices up approximately 68.66%.

95.     On or about January 13, 2014, Enterprise High School paid School Warehouse $31,671.55 for the August 29, 2013 and September 3, 2013 invoices, which together totaled $44,671.55.  A deposit of $13,000 Enterprise High School previously paid to School Warehouse was applied to cover the remainder owed.

*September 2014 Invoices*

96.     On an invoice dated September 16, 2014, School Warehouse billed Enterprise High School $33,147.93 for computer equipment and furniture as part of the Fraudulent Invoicing Scheme.  School Warehouse purchased the computer equipment and furniture from suppliers Florida Office Interiors, CDW, and Stampede Presentation Products at an actual cost of $17,042.95.  The difference in what School Warehouse paid for the furniture and what it

charged Enterprise High School was $16,104.98, meaning that School Warehouse marked the prices up approximately 94.50%.

97.     On an invoice dated September 17, 2014, School Warehouse billed Enterprise High School $17,696.33 for computer equipment and furniture as part of the Fraudulent Invoicing Scheme. School Warehouse purchased the computer equipment and furniture from suppliers CDW-G and Hertz at an actual cost of $13,607.52. The difference in what School Warehouse paid for the computer equipment and furniture and what it charged Enterprise High School was $4,088.81, meaning that School Warehouse marked the prices up approximately 30.05%.

98.     On or about November 12, 2014, Enterprise High School remitted payment to School Warehouse in the amount of $50,844.26 for the September 16, 2014 and September 17, 2014 invoices, which together totaled $50,844.26.

99.     Exhibit 7 delineates other examples of how Enterprise High School was damaged by the Fraudulent Invoicing Scheme.

**B.  Scheme 2: Fraudulent Charter School Program Grant Scheme**

100.     The May Enterprise also engaged in a fraudulent scheme to defraud Plaintiffs of substantial sums of money by submitting fraudulent invoices for reimbursement from the Charter Schools Program grant that River City Education and Palm Bay Education had been awarded.

101.     The federal government has established the Charter Schools Program ("*CSP*"), which provides grants to high-quality charter schools that can be used during the planning phase of the charter school and the roughly three (3) years following the opening of the charter school. There is a competitive selection process that charter schools must undergo if they wish

to receive CSP grant funds. Once awarded a CSP grant, charter schools may only use the funds on certain expenditures that are generally related to the operational costs of starting up the charter school and implementing the charter school's program during the early start-up years.

102. CSP grant funds are dispersed on a reimbursement basis. Charter schools awarded a CSP grant must spend money on qualifying goods or service up front and then submit invoices to the Florida Department of Education for reimbursement.

103. River City Education was awarded a CSP grant for San Jose Academy and San Jose Preparatory High School.

104. Palm Bay Education was awarded a CSP grant for Palm Bay Academy and Palm Bay Preparatory High School.

105. After River City Education and Palm Bay Education paid the amounts due under the fraudulent invoices received pursuant to the Fraudulent Invoicing Scheme, Newpoint Education Partners, at the direction of May, submitted the fraudulent invoices from School Warehouse to the Florida Department of Education for reimbursement from CSP grant funds. In the case of Palm Bay Education, this included fraudulent invoices from Red Ignition, LLC, in addition to the fraudulent invoices from School Warehouse.

106. In this way, River City Education and Palm Bay Education have been damaged twice over from the Fraudulent Invoicing Scheme. On the one hand, River City Education and Palm Bay Education were damaged when they overpaid School Warehouse and Red Ignition, LLC, for the fraudulently marked up amounts owing on each invoice. They were then damaged a second time when these invoices were submitted to the Florida Department of Education for reimbursement from CSP grant funds because, for each fraudulent invoice submitted by the May Enterprise to the Florida Department of Education, River City Education and Palm Bay

Education have an obligation to repay all amounts in excess of the actual cost of the goods purchased.

107.	The Fraudulent Invoicing Scheme further precluded River City Education and Palm Bay Education from using the CSP grant funds for the benefit of their students.

**C. Scheme 3: Fraudulent Apex Rebate Scheme**

108.	The May Enterprise also engaged in a fraudulent scheme to defraud the Plaintiffs and provide Newpoint Education Partners and the other RICO Defendants with kickbacks resulting from the purchase of digital curriculum from Apex Learning.

109.	Specifically, on or about May 28, 2009, Newpoint Education Partners, under the direction of May, entered into a Client Agreement for Digital Curriculum Solutions agreement with Apex Learning ("*Apex Agreement*") with a term ending on July 31, 2010, a true and correct copy of which is attached as **Exhibit "8."**  Under the terms of the Apex Agreement, Newpoint Education Partners agreed to purchase digital classroom curriculum from Apex Learning for use by students at the charter schools it managed.  The Apex Agreement was renewed each year by amendment from August 1, 2010 until July 31, 2014.

110.	Effective August 1, 2014, the parties entered into a new Client Agreement ("*Second Apex Agreement*").  **Exhibit "9."**  The Second Apex Agreement was renewed each year by amendment until July 31, 2017.  While the Second Apex Agreement and first amendment to the Second Apex Agreement were both executed by Marcus May on behalf of Newpoint Education Partners, the second amendment to the Second Apex Agreement that renewed it for the period from August 1, 2016 to July 31, 2017 was executed by Marcus May as Manager Member of Cambridge Education Group.  *See* **Exhibit "10."**

111.    On May 24, 2012, May sent a letter to Apex Learning with a proposal that Newpoint Education Partners would use Apex Learning's electronic curriculum for all the high schools it managed.  In exchange, May proposed that Newpoint Education Partners, starting with the 2012-2013 school year, receive a "rebate" (*i.e.*, a kickback) on each license purchased by a Newpoint Education Partners-managed school.  The Apex Agreement was amended on or about July 20, 2012 to include language about the rebates.  *See* **Exhibit "11."**

112.    In an interview with the Federal Bureau of Investigation, Stacy Pearson, the Account Manager at Apex Learning who was May's point of contact, acknowledged that such contract terms were unusual and that he in fact had never seen similar language in any other Apex Learning agreement.  *See* **Exhibit "12."**

113.    Under the Fraudulent Apex Rebate Scheme, Newpoint Education Partners and Cambridge Education Group-affiliated charter schools paid Apex Learning directly for licenses to use Apex Learning's digital curriculum.  Apex Learning then sent Newpoint Education Partners and later Rearden Capital—both entities owned and/or controlled by the May Enterprise—substantial rebates that often represented almost half of the amount paid to Apex Learning by Newpoint Education Partners and Cambridge Education Group-managed charter schools.

114.    Apex Learning accepted payment for the licenses directly from the charter schools themselves, who paid for the licenses using public funds.  At May's direction, Apex Learning sent Newpoint Education Partners four (4) "rebate" checks from January 21, 2013 until July 10, 2014 ranging from $44,062.50 to as much as $56,250.00.  May deposited these funds into the bank account of Newpoint Enterprises, LLC, a company owned and controlled by May.  Beginning on or about December 10, 2014, Apex Learning began sending rebate

checks to Rearden Capital at the direction of May.

115.    Neither Newpoint Enterprises, LLC, nor Rearden Capital were parties to the contract(s) between Newpoint Education Partners and Apex Learning.  Apex Learning continued to make rebate payments to Rearden Capital pursuant to the Fraudulent Apex Rebate Scheme until at least November 22, 2016.

116.    As described above, charter schools are public schools funded through state and federal tax dollars.  May directed Apex Learning to perpetuate this fraudulent scheme by sending substantial portions of these payments to Newpoint Education Partners or Rearden Capital as fraudulent kickbacks disguised as "rebates."

117.    Plaintiffs in this case were each harmed by the Fraudulent Apex Rebate Scheme perpetuated by May, Newpoint Education Partners, Cambridge Education Group, and Rearden Capital in the following ways:

**River City Education**

118.    During the 2013-2014 school year, River City Education paid Apex Learning $26,494.07.  The total payments to Apex Learning from Newpoint Education Partners and Cambridge Education Group schools was $315,000.  That year, Apex Learning paid Newpoint Education Partners $112,500.00 in fraudulent rebates.  The amount of the fraudulent rebates proportionally attributable to River City Education is approximately $9,462.17.

119.    During the 2014-2015 school year, River City Education paid Apex Learning $20,312.40.  The total payments to Apex Learning from Newpoint Education Partners and Cambridge Education Group schools was $456,250.  That year, Apex Learning paid Rearden Capital $217,000.00 in fraudulent rebates.  The amount of the fraudulent rebates proportionally attributable to River City Education is approximately $9,660.91.

120.     During the 2015-2016 school year, River City Education paid Apex Learning $9,366.68.   The total payments to Apex Learning from Newpoint Education Partners and Cambridge Education Group schools was $560,500.   That year, Apex Learning paid Rearden Capital $279,000 in fraudulent rebates.   The amount of the fraudulent rebates proportionally attributable to River City Education is approximately $4,662.45.

### Palm Bay Education

121.     During the 2013-2014 school year, Palm Bay Education paid Apex Learning $7,019.50.   The total payments to Apex Learning from Newpoint Education Partners and Cambridge Education Group schools was $315,000.   That year, Apex Learning paid Newpoint Education Partners $112,500 in fraudulent rebates.   The amount of the fraudulent rebates proportionally attributable to Palm Bay Education is approximately $2,506.96.

122.     During the 2014-2015 school year, Palm Bay Education paid Apex Learning $15,624.80.   The total payments to Apex Learning from Newpoint Education Partners and Cambridge Education Group schools was $456,250.   That year, Apex Learning paid Rearden Capital $217,000 in fraudulent rebates.   The amount of the fraudulent rebates proportionally attributable to Palm Bay Education is approximately $7,431.41.

123.     During the 2015-2016 school year, Palm Bay Education paid Apex Learning $9,366.68.   The total payments to Apex Learning from Newpoint Education Partners and Cambridge Education Group schools was $560,500.   That year, Apex Learning paid Rearden Capital $279,000 in fraudulent rebates.   The amount of the fraudulent rebates proportionally attributable to Palm Bay Education is approximately $4,662.45.

**Enterprise High School**

124.     During the 2012-2013 school year, Enterprise High School paid Apex Learning $104,261.25.  The total payments to Apex Learning from Newpoint Education Partners and Cambridge Education Group schools was $246,750.  That year, Apex Learning paid Newpoint Education Partners $88,125 in fraudulent rebates.  The amount of the fraudulent rebates proportionally attributable to Enterprise High School is approximately $37,236.16.

125.     During the 2013-2014 school year, Enterprise High School paid Apex Learning $91,204.42.  The total payments to Apex Learning from Newpoint Education Partners and Cambridge Education Group schools was $315,000.  That year, Apex Learning paid Newpoint Education Partners $112,500 in fraudulent rebates.  The amount of the fraudulent rebates proportionally attributable to Enterprise High School is approximately $32,573.01.

126.     During the 2014-2015 school year, Enterprise High School paid Apex Learning $106,770.80.  The total payments to Apex Learning from Newpoint Education Partners and Cambridge Education Group schools was $456,250.00.  That year, Apex Learning paid Rearden Capital $217,000.00 in fraudulent rebates.  The amount of the fraudulent rebates proportionally attributable to Enterprise High School is approximately $50,781.95.

127.     During the 2015-2016 school year, Enterprise High School paid Apex Learning $107,634.82.  The total payments to Apex Learning from Newpoint Education Partners and Cambridge Education Group schools was $560,500.00.  That year, Apex Learning paid Rearden Capital $279,000.00 in rebates.  The amount of the rebates proportionally attributable to Enterprise High School is approximately $52,577.37.

D. **Scheme 4: Money Laundering Scheme**

128.     The May Enterprise sought to further conceal the May Enterprise Scheme by laundering the fraudulently obtained proceeds through multiple business entities and passing the money through countless bank accounts to make it harder to trace (the "***Money Laundering Scheme***").

129.     Through the Money Laundering Scheme, each of the Defendants engaged in schemes and artifices with the common goal of concealing or disguising the nature, location, source, ownership, or control of proceeds derived from the May Enterprise's racketeering efforts.  The kickbacks were often disguised as commissions or consulting fees for real estate investments and were paid to May, Mary May, and the Kunkemoellers, either directly or through one of their controlled entities such as Solo Products, Direct Store Delivery, Rearden Capital, and the Affiliate Defendants.

130.     Specific examples of instances in which Defendants engaged in the Money Laundering Scheme, include, but are not limited to, the following:

      a.  On or about March 23, 2010, Red Ignition, LLC, transferred to Marcus May $157,500 in illicit proceeds from the Fraudulent Invoicing Scheme.

      b.  On or about March 4, 2014, School Warehouse transferred to Fifth Third Bank $175,000 in illicit proceeds from the Fraudulent Invoicing Scheme to pay Kunkemoeller's mortgage on his home.

      c.  On or about April 25, 2014, School Warehouse transferred to Direct Store Delivery $200,000 in illicit proceeds derived from the Fraudulent Invoicing Scheme.  Subsequently, on or about May 2, 2014, Direct Store Delivery transferred to Marcus May a portion of the funds totaling $175,000.  The

remaining $25,000 was transferred to Crossburn Properties, LLC, a company owned and controlled by May, Mary May and/or May and Kunkemoeller.

d.   On or about February 5, 2015, School Warehouse transferred to Rearden Capital $58,000 in illicit proceeds derived from the Fraudulent Invoicing Scheme.

e.   On or about March 4, 2015, School Warehouse transferred to Direct Store Delivery $125,000 in illicit proceeds derived from the Fraudulent Invoicing Scheme.  On or about March 5, 2015, this money was then used to purchase real property.

f.   On or about May 16, 2015, School Warehouse transferred to Solo Products $79,041.98 in illicit proceeds from the Fraudulent Invoicing Scheme.

g.   On or about June 23, 2015, School Warehouse transferred to Solo Products $54,211.31 in illicit proceeds from the Fraudulent Invoicing Scheme.

h.   On or about August 28, 2015, School Warehouse transferred to Solo Products $100,000 in illicit proceeds from the Fraudulent Invoicing Scheme.

i.   On or about June 19, 2015, School Warehouse transferred to Rearden Capital $100,000 in illicit proceeds from the Fraudulent Invoicing Scheme.

j.   On or about July 1, 2016, School Warehouse transferred to Kunkemoeller $220,000 in illicit proceeds derived from the Fraudulent Invoicing Scheme.

131.   Each transaction described above was designed to conceal or disguise the nature and source of the ill-gotten proceeds derived from the May Enterprise's racketeering efforts.

### E.  Scheme 5: Fraudulent Broker Fees/Lease Fees Scheme

132.    May, on behalf of Newpoint Education Partners, also orchestrated a fraudulent kickback scheme involving real estate broker fees and lease fees ("*Fraudulent Broker Fees/Lease Fees Scheme*").  Plaintiffs Enterprise High School and River City Education were directly harmed by the Fraudulent Broker Fees/Lease Fees Scheme, as described more fully below:

**Enterprise High School**

133.    On May 19, 2011, Enterprise High School entered into a lease ("*Enterprise Lease*") with KOS Corp, a Florida corporation, to lease certain property located at 1515 June Avenue, Panama City, Florida 32405.  **Exhibit '13."**  Newpoint Education Partners was a party to the Enterprise Lease as well, signing as a guarantor for Enterprise High School.  The Enterprise Lease contained a provision whereby Newpoint Education Partners would receive a "consulting fee" equal to 3% of the base rents for the first two years of the Enterprise Lease.

134.    On August 31, 2011, National Properties Trust, Inc., a related entity to KOS Corp., sent Newpoint Enterprises, LLC (a May controlled entity), a check in the amount of $12,510.09 as payment for the "consulting fee" due under the Enterprise Lease.  On December 9, 2013, National Properties Trust, Inc., sent Newpoint Enterprises LLC a check in the amount of $37,675.84 as payment for the "consulting fee" due under the Enterprise Lease.

135.    Further, upon information and belief, May demanded that National Properties Trust write a check to his wife, Mary May, in the approximate amount of $60,000 before he would finalize the lease agreement.

**River City Education**

136.     Sometime around December 2012, Marcus May, on behalf of Newpoint Education Partners, entered into a Broker Agreement with Michael Glaser, a real estate broker licensed to practice in the State of Florida.  **Exhibit "14."**

137.     Under the terms of the Broker Agreement, Newpoint Education Partners agreed to use Mr. Glaser as its exclusive broker for real estate transactions involving Newpoint Education Partners–managed charter schools.   In return, Mr. Glaser would share with Newpoint Education Partners 20% of the commissions that he received.

138.     This Broker Agreement was illegal, per section 475.25, Florida Statutes, as real estate brokers are forbidden from sharing commissions with unlicensed persons.  Further, this presented an actual and apparent conflict of interest, as Newpoint Education Partners was the management company of the charter schools for which Mr. Glaser was securing real property.

139.     Newpoint Education Partners and Mr. Glaser remained bound to the Broker Agreement until it was terminated on October 20, 2015 by way of a Termination and Release Agreement signed by the parties.

140.     Mr. Glaser acted as a broker for River City Education, and helped it secure the property upon which San Jose Academy and San Jose Preparatory High School are both currently co-located.  San Jose Academy and San Jose High School paid Mr. Glaser a brokerage fee of approximately $51,250.00 for his services.  Subsequently, Mr. Glaser wrote a check to Newpoint Education Partners, whereby Newpoint Education Partners received a $10,250.00 kickback per the illegal Broker Agreement.

**F.  Scheme 6:  Fraudulent Student Lunch Proceeds Scheme**

141.     May organized a scheme to defraud Plaintiff Palm Bay Education of certain monies generated through student lunches and snacks.

142.     Palm Bay Education ran a food counter at Palm Bay Academy and Palm Bay Preparatory High School where students and staff could purchase snacks and other food items.

143.     The food counter was run by Palm Bay Education employees and all inventory was purchased with Palm Bay Education's funds.

144.     To facilitate this scheme, May would periodically visit the food counter, take the money that had been raised through the sale of the food counter's inventory to customers, and deposit that money in a bank accountant unconnected to Palm Bay Education to which only the May Enterprise had access and control.

145.     Palm Bay Education was thereby deprived of and never realized the benefit of these funds, which were substantial.

**G.  Scheme 7: Real Estate Acquisition Scheme**

146.     The Mays, Kunkemoellers, and others such as the Affiliate Defendants used the illicit proceeds from the May Enterprise Scheme to acquire title or interests in the following real properties located in Florida and Ohio, which includes homestead properties, that they often acquired in the name(s) of one or more of their controlled entities as a means of obfuscating the true owners of the properties.

***Newpoint Enterprises, LLC***

147.     Bank records show that from 2012 through 2016, Newpoint Enterprises, LLC, a company owned and controlled by May through its manager, Newpoint Education Partners, LLC, received more than $400,000 in relation to the May Enterprise Scheme.

148.    Many of these funds were utilized by Newpoint Enterprises, LLC, to purchase and to make mortgage payments on the following real properties:

### i.    2426 Vaccaro Dr., Sarasota, FL 34231

149.    On July 25, 2013, Apex Learning, Inc., paid Newpoint Enterprises, LLC, a "rebate" in the amount of $44,062.50.  On November 20, 2013, May caused Newpoint Enterprises, LLC, to transfer a portion of the $44,062.50 (*i.e.*, $26,778.28) to May, individually.  That same day May transferred the $26,778.28 to Universal Land Title as an escrow payment.  Two days later, on November 22, 2013, Universal Land Title utilized the $26,778.28 escrow payment as part of the purchase price for the property, which was titled to Marcus May and Mary May.

### ii.    4720 Roosevelt Blvd., Middletown, OH 45044

150.    On December 21, 2012, Direct Store Delivery, made a "vendor payment" in the amount of $50,000 to Newpoint Enterprises, LLC.  On March 18, 2013, Newpoint Enterprises, LLC, transferred $9,322.34 to AmeriTitle as an escrow payment.  On June 14, 2013, AmeriTitle utilized the $9,322.34 escrow payment as part of the purchase price for the property, which was titled to Roosevelt Properties, LLC (a company owned and controlled by May and Mary May).  On May 12, 2013, Newpoint Enterprises, LLC, wrote a check to AmeriTitle in the amount of $100,386.30, which was also as part of the purchase price for the property.

### iii.    13111 Crossburn Ave., Cleveland, OH 44135

151.    On March 20, 2013, Solo Products, Inc., made a "vendor payment" in the amount of $100,000 to Newpoint Enterprises, LLC.  On June 11, 2013, Newpoint Enterprises, LLC, transferred $69,763.61 to First American Title as an escrow payment.  On June 12, 2013,

First American Title utilized the $69,763.61 escrow payment as part of the purchase price for the property, which was titled to Crossburn Properties, LLC (a company which is owned and controlled by May, Mary May, and/or Kunkemoeller).

### iv.     1133 Meadow Spur, Akron, OH 44333

152.    Upon information and belief, proceeds from the May Enterprise Scheme were used to purchase or otherwise acquire an interest in the property located at 1133 Meadow Spur, Akron, OH 44333.

### *Leekca Properties, LLC*

153.    Bank records show that from 2010 through 2014, Leekca Properties, LLC, a company owned and controlled by May and Mary May, received more than $600,000 in relation to the May Enterprise Scheme and funds from the sale of properties owned by Roosevelt Properties, LLC, and Crossburn Properties, LLC.

154.    Many of these funds were utilized by Leekca Properties, LLC, a company owned and controlled by May and/or Mary May, to purchase and to make mortgage payments on the following real properties:

### i.     7656 Uliva Way, Sarasota, FL 34238

155.    On September 28, 2010, Newpoint Education Partners, LLC, paid Leekca Properties, LLC, a purported lease payment in the amount of $3,000.  On October 29, 2010, Leekca Properties, LLC, made, on behalf of May and Mary May, a mortgage payment in the amount of $1,875.88 to Chase Home Finance in relation to the property.  This payment is one of many mortgage payments made by Leekca Properties, LLC, to Chase Home Finance in relation to the property.

### ii.      **2426 Vaccaro Dr., Sarasota, FL 34231**

156.     On September 20, 2013, Newpoint Education Partners, LLC, paid Leekca Properties, LLC, a purported lease payment in the amount of $3,500.  On November 20, 2013, May caused Leekca Properties, LLC, to transfer the $3,500 lease payment to May, individually. That same day May transferred the $3,500 to Universal Land Title as an escrow payment.  Two days later, on November 22, 2013, Universal Land Title utilized the $3,500 escrow payment as part of the purchase price for the property, which was titled to Marcus May and Mary May.

### iii.      **13334 Torresina Terrace, Brandenton, FL 34211**

157.     On August 16, 2013, Newpoint Education Partners, LLC, paid Leekca Properties, LLC, a purported lease payment in the amount of $3,500.  On September 27, 2013, Leekca Properties, LLC, made, on behalf of May and Mary May, a mortgage payment in the amount of $1,220.20 to Flagstar Bank in relation to the property.  This payment is one of many mortgage payments made by Leekca Properties, LLC, to Flagstar Bank in relation to 13334 Torresina Terrace, Brandenton, FL 34211.

### iv.      **275 West Market Street, Akron, OH 44313**

158.     On December 21, 2012, Direct Store Delivery made a "vendor payment" in the amount of $110,000 to Surety Title as an escrow payment.  That same day Surety Title utilized the $110,000 escrow payment as part of the purchase price for the property, which was titled to Leekca Properties, LLC (a company owned and controlled by May and Mary).

### *Rearden Capital, LLC*

159.     Bank records show that from 2014 through 2016, Rearden Capital, a company owned and controlled by May and Mary, received more than $600,000 in relation to the May Enterprise Scheme.

160.     Many of these funds were utilized by Reardon Capital, to purchase and to make mortgage payments on the following real properties:

### i.     251 Schocalog Road, Akron, OH 44313

161.     On March 10, 2016, Apex Learning paid Rearden Capital a "rebate" in the amount of $139,500.  On March 18, 2016, May caused Rearden Capital to transfer a portion of the $139,500 ($92,761.81) to Peoples' Bank as an escrow payment.  The next day, on June 1, 2016, Peoples' Bank utilized the $92,761.81 escrow payment as part of the purchase price for the property, which was titled to Rearden Capital a company owned and controlled by May and Mary.

### ii.     4855-4859 Main Street, Akron, OH 44319

162.     On December 10, 2014, Apex Learning paid Rearden Capital a "rebate" in the amount of $54,250.  On February 26, 2015, May caused Rearden Capital to transfer a portion of the $54,250 ($52,891.73) to Main Street Properties, LLC, a company which, upon information and belief, is owned and controlled by May.  That same day May caused Main Street Properties, LLC, to transfer the $52,891.73 to First American Title as an escrow payment.  The same day First American Title utilized the $54,250 escrow payment as part of the purchase price of the property, which was titled to Main Street Properties, LLC.

### iii.     5806 Broadway Ave., Cleveland, OH 44127

163.     On February 5, 2015, School Warehouse made a "vendor payment" in the amount of $58,000 to Reardon Capital.  On April 13, 2015, May caused Rearden Capital to transfer a portion of the $58,000 (*i.e.*, $10,025.99) to First American Title as an escrow payment.  Two days later First American Title utilized the $10,025.99 escrow payment as part of the purchase price of the property, which was titled to 5806 Broadway Properties, LLC (a

company owned and controlled by May and Mary).

### iv.    481 North Cleveland Massillon Road, Akron, OH 44333

164.     On June 19, 2015, School Warehouse, Inc., made a "vendor payment" in the amount of $100,000 to Reardon Capital. On August 5, 2015, May caused Rearden Capital to transfer a portion of the $100,000 ($41,135.16) to First American Title as an escrow payment. Two days later First American Title utilized the $41,135.16 escrow payment as part of the purchase price of the property, which was titled to Blue Victorian Property, LLC (a company owned and controlled by May and Mary).

### v.    4877 Pearl Road, Cleveland, OH 44109

165.     On July 27, 2015, Apex Learning, Inc., paid Reardon Capital a "rebate" in the amount of $54,250. On August 20, 2015, May caused Reardon Capital to transfer a portion of the $54,250 ($27,444.38) to 4887 Pearl Property, LLC, a company owned and controlled by May. The next day May caused 4887 Pearl Property, LLC, to transfer the $27,444.38 to Liberty Bank as a mortgage payment on the property.

### vi.    1500-1530 Superior Ave., NE, Canton, OH 44705

166.     On April 29, 2016, Apex Learning paid Reardon Capital a "rebate" in the amount of $69,750. On June 30, 2016, May caused Reardon Capital to transfer the $69,750 to First American Title as an escrow payment. The same day First American Title utilized the $69,750 escrow payment as part of the purchase price for the property, which was titled to Reardon Capital.

*School Warehouse/Kunkemoeller*

167.     On or about December 12, 2015, the May Enterprise transferred $140,000 from an account owned by School Warehouse to Market Canton, LLC (a company which, based

upon information and belief, is owned and controlled by May and/or Mary May and Kunkemoeller).

### i      575 Delaware Ave., Akron, Ohio 44303

168.     Upon information and belief, a portion of the $140,000 was used to acquire title to 575 Delaware Ave., Akron, Ohio 44303, in the name of Market Canton, LLC.

### ii.     174 Treviso Ct., North Venice, FL 34275

169.     Bank records reveal that, on or about March 20, 2014, School Warehouse paid $175,000 toward the mortgage on the Kunkemoellers' personal residence, located at 174 Treviso Ct., North Venice, FL 34275.

### iii.     708 South Street, Key West, Florida 33040

170.     Upon information and belief, a portion of the funds transferred from School Warehouse to Solo Products was used to pay toward the mortgage of the Kunkemoellers' rental property located at 708 South Street, Key West, FL 33040.

### *Kunkemoeller Trust*

171.     Upon information and belief, the Kunkemoeller Trust was unjustly enriched by the Money Laundering Scheme.

### i.     793 Watch Point Drive, Cincinnati, Ohio 45230

172.     On or about July 7, 2017, the real property located at 793 Watch Point Drive, Cincinnati, Ohio, was transferred by Susan Kunkemoeller to the Kunkemoeller Trust for little or no consideration in furtherance of the May Enterprise Scheme to impede the victims of the May Enterprise from recovering proceeds of the fraud.

## H. **Sham Divorce**

173.     In an effort to further conceal and impede the ability of victims of the May Enterprise Scheme to recover funds from which they were defrauded, May and his now former wife, Mary May, agreed to a sham divorce.

174.     For instance, May was arrested on June 28, 2017 by law enforcement officers in Pensacola, Florida.  Less than a month later, on July 13, 2017, May and Mary May executed a Marital Settlement Agreement through which Mary May received ill-gotten cash and other property that was acquired through the May Enterprise Scheme.  A true and correct copy of the Marital Settlement Agreement is attached here to as **Exhibit "15."**

175.     The Marital Settlement Agreement also resulted in Mary May gaining an ownership interest in multiple business entities May utilized throughout his schemes and which held or still hold real property purchased with ill-gotten proceed from the May Enterprise Scheme, including, but not limited to the follow:

- Crossburn Properties, LLC;

- 4877 Pearl Property, Inc.;

- 5806 Broadway Properties, LLC;

- 840 W State St., LLC;

- Roosevelt Properties, LLC;

- Gulfstream, LLC; and

- Leekca Properties, LLC

176.     May and Mary May had no intention of ending their relationship when they executed the Marital Settlement Agreement.  Rather, their purpose in divorcing one another was to protect the assets they acquired through the May Enterprise Scheme by having such

assets pass to Mary May through a purported legitimate divorce proceeding.

## INTRODUCTION TO RICO COUNTS

177.    The RICO Defendants in this case have committed violations of the federal

Racketeer Influenced and Corrupt Organization Act ("***RICO***"), 18 U.S.C. § 1961, *et seq*, and

Florida's Civil Remedies for Criminal Practices Act ("***Florida RICO***"), section 772.101,

Florida Statutes, *et seq*.  The Florida RICO statutes were patterned on the federal RICO statutes;

thus, courts look to case law interpreting the federal RICO statutes in construing Florida RICO.

*Spadaro v. City of Miramar*, 855 F. Supp. 2d 1317, 1349 (Fla. S.D. 2012).  As such, the analysis

will primarily be the same for both the RICO and Florida RICO counts alleged below.

### *Enterprise*

178.    The RICO Defendants constitute an "association-in-fact" enterprise under

RICO, 18 U.S.C. § 1961(4), and Florida RICO, section 772.102(3), Florida Statutes, because

they are a group of individuals and entities associated in fact through their operation and

management of the May Enterprise.  These individuals and entities had the common purpose

of defrauding the Plaintiffs of substantial sums of money through the May Enterprise Scheme,

enriching members of the May Enterprise and concealing these activities.  The May Enterprise

had longevity sufficient to permit the RICO Defendants to continue to pursue the May

Enterprise's purposes over the course of several years from at least 2009 to 2016 (and in many

respects continuing to the present).

179.    May was the principal architect of the May Enterprise.  Through agreements

with each of the other RICO Defendants, May orchestrated multiple schemes with the common

goal of defrauding the Plaintiffs of substantial sums of money, while May and other RICO

Defendants received kickbacks.  May directed and controlled Newpoint Education Partners, Cambridge Education Group, Rearden Capital, and other business entities used to perpetrate this fraud upon Plaintiffs.  May concealed and misrepresented to the Plaintiffs his relationship with the other RICO Defendants, the Affiliate Defendants, and other parties involved in the May Enterprise Scheme.

180.    Mary May is a key member of the May Enterprise.  Mary May agreed to and did conduct and participate in the conduct of the May Enterprise's affairs through a pattern of racketeering activity in furtherance of the May Enterprise Scheme.  Mary May, along with her husband, May, directed and controlled the Affiliate Defendants, and other business entities used to perpetrate this fraud upon the Plaintiffs.  Her activities were aimed at intentionally defrauding the Plaintiffs of substantial sums of money, enriching the RICO Defendants and others that may yet be unidentified, and concealing these activities

181.    Kunkemoeller agreed with May to perpetrate, *inter alia*, the Fraudulent Invoicing Scheme, Money Laundering Scheme, and Real Estate Acquisition Scheme against the Plaintiffs.  Specifically, Kunkemoeller founded, owned, assisted, and/or directed other RICO Defendants in carrying out the Fraudulent Invoicing Scheme.  Kunkemoeller also participated in the Money Laundering Scheme by laundering proceeds derived from the Fraudulent Invoicing Scheme through his own business entities and receiving laundered funds from other entities associated with the May Enterprise.  Kunkemoeller also used fraudulent proceeds to invest in real property through the Real Estate Acquisition Scheme.  Kunkemoeller concealed and misrepresented to the Plaintiffs his relationship with the other RICO Defendants, the Affiliate Defendants, and other parties involved in the May Enterprise Scheme.

182.    During all relevant times, Newpoint Education Partners was directed and controlled by May.  Newpoint Education Partners contracted with the various Plaintiffs to provide management services.  In so doing, Newpoint Education Partners, led by May, had direct control over Plaintiffs' finances and accounting books.  Newpoint Education Partners used its control and power over Plaintiffs to have Plaintiffs enter into various agreements or business dealings with RICO Defendants and other parties in order to perpetrate fraud against them.  Newpoint Education Partners concealed and misrepresented to Plaintiffs its relationship with the other RICO Defendants, the Affiliate Defendants, and other parties involved in the May Enterprise Scheme.  Newpoint Education Partners participated directly or indirectly in each of the component schemes making up the May Enterprise Scheme.

183.    During all relevant times, Cambridge Education Group was directed and controlled by May.  Cambridge Education Group used Newpoint Education Partners as an instrumentality to contract with the various Plaintiffs to provide management services and assume control of the Plaintiffs' finances.  Cambridge also participated directly in the Money Laundering Scheme and Fraudulent Apex Rebate Scheme.

184.    During all relevant times, School Warehouse was directed and controlled by Kunkemoeller.  Beginning around 2011, School Warehouse became the primary entity used to perpetrate the Fraudulent Invoicing Scheme against the Plaintiffs.  School Warehouse also participated in the Money Laundering Scheme by transferring proceeds from the Fraudulent Invoicing Scheme to other entities or individuals associated with the May Enterprise.

185.    During all relevant times, Red Ignition, LLC, was directed and controlled by May.  From approximately 2009 to 2011, Red Ignition, LLC, was the primary entity used to perpetrate the Fraudulent Invoicing Scheme.

186.     During all relevant times, Rearden Capital was directed and controlled by May and/or Mary May. Rearden Capital participated in the Fraudulent Apex Rebate Scheme by accepting fraudulent rebates from Apex Learning.  Rearden Capital also participated in the Money Laundering Scheme by accepting and laundering proceeds derived from the May Enterprise Scheme, which were subsequently utilized by Rearden Capital to acquire interests in real property through the Real Estate Acquisition Scheme.

187.     During all relevant times, Solo Products was directed and controlled by Kunkemoeller.  Solo Products participated in the Money Laundering Scheme by accepting and laundering proceeds derived from the May Enterprise Scheme.

188.     During all relevant times, Direct Store Delivery was directed and controlled by Kunkemoeller.  Direct Store Delivery participated in the Money Laundering Scheme by accepting and laundering proceeds derived by the May Enterprise Scheme.

189.     The May Enterprise's acts of racketeering activity have been conducted in furtherance of its objectives, having the same or similar intent, results, accomplices, victims, and methods of commission, which have persisted for a period of sufficient longevity.

### *Interstate Commerce*

190.     The May Enterprise Scheme affected interstate commerce in that: (a) proceeds from the May Enterprise Scheme were deposited in financial institutions in the United States; (b) proceeds from the May Enterprise Scheme were transferred between various parties and financial institutions through wire or other means affecting interstate commerce; (c) the May Enterprise Scheme involved financial institutions in the United States which affect interstate commerce; (d) the RICO Defendants utilized wire or radio communications in interstate commerce in furtherance of the May Enterprise Scheme; (e) the RICO Defendants utilized the

United States Postal Service or other carriers in furtherance of the May Enterprise Scheme; (f) the RICO Defendants committed crimes in various states, including but not limited to Florida and Ohio; and (g) the May Enterprise utilized proceeds from the May Enterprise Scheme to acquire, develop, and manage real property located in at least Florida and Ohio.

### *Predicate Acts*

191.    The RICO Defendants in this case have committed at least two (2) predicate acts in furtherance of the May Enterprise Scheme, as described under each count herein.

192.    Each RICO Defendants' predicate acts constituted a pattern of racketeering activity, with both closed-ended continuity and open-ended continuity, as these activities were ongoing for over seven years and there is still a threat of continuing racketeering activity.

193.    These incidents of racketeering activity were not isolated incidents, but separate yet interrelated acts forming a systematic and ongoing pattern of racketeering activity under 18 U.S.C. § 1961(5).  This pattern of racketeering activity extended over a substantial period of time, with the racketeering activity starting in or about 2009 and continuing to the present. Between these dates, the RICO Defendants engaged in multiple acts of racketeering described herein in furtherance of the May Enterprise's criminal objectives.

194.    Further, the RICO Defendants have already established a pattern of engaging in multiple schemes, including schemes to launder proceeds from racketeering activities. Consequently, there is a risk that such misconduct is continuing now and will continue into the future.

### *Injury*

195.    Each of the RICO Defendants' predicate acts have injured Plaintiffs by causing them to incur monetary damages, a substantial amount of unnecessary attorneys' fees,

expenses, and other damages directly by reason of the RICO Defendants' brazen crimes.  In addition, Plaintiffs have suffered harm to their reputation in the communities they serve.

196.    These injuries to Plaintiffs are a direct and proximate result of the RICO Defendants' violations of 18 U.S.C. § 1962 and section 772.103, Florida Statutes.  Plaintiffs are victims of the illegal acts of May Enterprise.  Plaintiffs have suffered and continue to suffer the loss of their funds, harm to their business reputation, attorneys' fees, litigation expenses, and other damages arising from the racketeering conduct of the May Enterprise in an amount to be determined at trial.

## COUNT I: FEDERAL RICO (18 U.S.C. § 1962(c) & (d))
### (Against Marcus May)

197.    Plaintiffs incorporate by reference paragraphs 1 through 196 of this Complaint as if set forth in full.

198.    May is a key member of the May Enterprise, an "association-in-fact" enterprise under RICO, 18 U.S.C. § 1961(4).  May was the principal architect of the May Enterprise and participated in the affairs of the May Enterprise through a pattern of racketeering activity in furtherance of the May Enterprise Scheme.

199.    May engaged in at least two predicate acts within a ten-year period that constitute a pattern of "racketeering activities" under the Federal RICO statute, 18 U.S.C. § 1961(1).  These racketeering activities were aimed at intentionally defrauding the Plaintiffs of substantial sums of money, enriching the RICO Defendants and others that may yet be unidentified, and concealing these activities.  Specific predicate acts that May engaged in include, but are not limited to, the following:

52

a.  In violation of 18 U.S.C. § 1341, at the direction of May, Red Ignition, LLC, mailed Palm Bay Education fraudulent invoices that included items substantially marked up above costs as part of the Fraudulent Invoicing Scheme, including, but not limited to, those fraudulent invoices detailed in Paragraphs 86 through 88.

b.  In violation of 18 U.S.C. § 1341, at the direction of May, School Warehouse mailed the Plaintiffs fraudulent invoices that included items substantially marked up above costs as part of the Fraudulent Invoicing Scheme, including, but not limited to, those fraudulent invoices detailed in Paragraphs 74 through 99.

c.  In violation of 18 U.S.C. § 1341, at the direction of May, Newpoint Education Partners mailed the Plaintiffs fraudulent invoices that included items substantially marked up above costs as part of the Fraudulent Invoicing Scheme, including, but not limited to, those fraudulent invoices detailed in Paragraphs 69 through 99.

d.  In violation of 18 U.S.C. § 1343, May engaged in various email communications with Apex Learning, where he devised a scheme or artifice to defraud the Plaintiffs of substantial sums of money through the Fraudulent Apex Rebate Scheme and negotiated with Apex Learning the terms of the scheme or artifice, including, but not limited to, those communications described in Paragraphs 108 through 127.

e.  In violation of 18 U.S.C. § 1343, May directed Apex Learning to transmit to Rearden Capital fraudulent kickbacks disguised as "rebates" derived from the

Fraudulent Apex Rebate Scheme through wire or other means, as described in Paragraphs 111 through 117.

f.  In violation of 18 U.S.C. § 1343, at the direction of May, Rearden Capital conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraphs 113 through 127; 129 through 131; 159 through 164; and 186.

g.  In violation of 18 U.S.C. § 1343, at the direction of May, Leekca Properties conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraphs 153 through 158.

h.  In violation of 18 U.S.C. § 1343, at the direction of May, Broadway Properties conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraph 163.

i.  In violation of 18 U.S.C. § 1343, at the direction of May, Roosevelt Property conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraphs 150 and 153.

j.  In violation of 18 U.S.C. § 1343, at the direction of May, 840 W. State St. conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraphs 32 and 175.

k.  In violation of 18 U.S.C. § 1343, at the direction of May, Blue Victorian Property conducted or participated in financial transactions through wire of

proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraph 164.

l.  In violation of 18 U.S.C. § 1343, at the direction of May, Crossburn Properties conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraphs 130, 151, and 153.

m.  In violation of 18 U.S.C. § 1343, at the direction of May, Main Street Properties conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraph 162.

n.  In violation of 18 U.S.C. § 1343, at the direction of May, Market Canton conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraphs 167 through 168.

o.  In violation of 18 U.S.C. § 1956, May conducted or participated in financial transactions designed to disguise the nature, location, source, ownership, or control of proceeds derived from the Fraudulent Invoicing Scheme and other component schemes of the May Enterprise Scheme, including, but not limited to, those financial transactions identified in Paragraphs 69 through 99; 128 through 131; 146 through 172; and 173 through 176.

200.  May unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c), as described above, in violation of 18 U.S.C. § 1962(d).

201.     Upon information and belief, May knew that he was engaged in a conspiracy to commit the predicate acts, and knew that the predicate acts were part of such racketeering activity, and his participation in each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

202.     As a direct and proximate result of May's conspiracy, the overt acts taken in furtherance of that conspiracy, and the racketeering activities in violation of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property.

203.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover compensatory damages, treble damages, plus costs and attorneys' fees, from May and the other RICO Defendants.

WHEREFORE, Plaintiffs demand judgment against May and relief as follows:

a) An order that May, his officers, agents, employees, and any persons in active concert or participation with them be restrained and enjoined from directly or indirectly transferring, selling, alienating, liquidating, converting, withdrawing, or otherwise disposing of any money or other of May's assets;

b) Damages, trebled according to 18 U.S.C. § 1964(c) for which all RICO Defendants are jointly and severally liable;

c) A finding of alter ego liability between May and his controlled entities;

d) Pre-judgment interest;

e) Plaintiffs' reasonable attorneys' fees and costs according to 18 U.S.C. § 1964(c);

f) An accounting of May's assets; and

g) Imposition of an equitable lien and constructive trust.

## COUNT II: FEDERAL RICO (18 U.S.C. § 1962(c) & (d))
### (Against Steven Kunkemoeller)

204.     Plaintiffs incorporate by reference paragraphs 1 through 196 of this Complaint as if set forth in full.

205.     Kunkemoeller is a key member of the May Enterprise, an "association-in-fact" enterprise under RICO, 18 U.S.C. § 1961(4).  Kunkemoeller agreed to and did conduct and participate in the conduct of the May Enterprise's affairs through a pattern of racketeering activity in furtherance of the May Enterprise Scheme.

206.     Kunkemoeller engaged in at least two predicate acts within a ten-year period that constitute a pattern of "racketeering activities" under the Federal RICO statute, 18 U.S.C. § 1961(1).  These racketeering activities were aimed at intentionally defrauding the Plaintiffs of substantial sums of money, enriching the RICO Defendants and others that may yet be unidentified, and concealing these activities.   Specific predicate acts that Kunkemoeller engaged in include, but are not limited to, the following:

  a. In violation of 18 U.S.C. § 1341, at the direction of Kunkemoeller, School Warehouse mailed the Plaintiffs fraudulent invoices that included items substantially marked up above costs as part of the Fraudulent Invoicing Scheme, including, but not limited to, those fraudulent invoices detailed in Paragraphs 74 through 99.

  b. In violation of 18 U.S.C. § 1343, at the direction of Kunkemoeller, School Warehouse conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in

Paragraphs 74 through 99.

c. In violation of 18 U.S.C. § 1343, at the direction of Kunkemoeller, Direct Store Delivery conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraphs 128 through 131; 150; 158; and 188.

d. In violation of 18 U.S.C. § 1343, at the direction of Kunkemoeller, Solo Products conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraphs 76; 129 through 131; 151; 170; and 187.

e. In violation of 18 U.S.C. § 1343, at the direction of Kunkemoeller, Red Ignition, LLC, conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraphs 75; 87 through 88; 105 through 106; 129 through 131; and 185.

f. In violation of 18 U.S.C. § 1343, at the direction of Kunkemoeller, Market Canton conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraphs 167 through 168.

g. In violation of 18 U.S.C. § 1343, at the direction of Kunkemoeller, Crossburn Properties conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraphs 129 through 131; 151; and 153.

h. In violation of 18 U.S.C. § 1956, Kunkemoeller conducted or participated in financial transactions designed to disguise the nature, location, source,

ownership, or control of proceeds from the Fraudulent Invoicing Scheme, including, but not limited to, those financial transactions identified in Paragraphs 69 through 99; 128 through 131; and 146 through 172.

207.     Kunkemoeller unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c), as described above, in violation of 18 U.S.C. § 1962(d).

208.     Upon information and belief, Kunkemoeller knew that he was engaged in a conspiracy to commit the predicate acts, and knew that the predicate acts were part of such racketeering activity, and his participation in each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

209.     As a direct and proximate result of Kunkemoeller's conspiracy, the overt acts taken in furtherance of that conspiracy, and the racketeering activities in violation of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property.

210.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover compensatory damages, treble damages, plus costs and attorney's fees, from Kunkemoeller and the other RICO Defendants.

WHEREFORE, Plaintiffs demand judgment against Kunkemoeller and relief as follows:

a)   An order that Kunkemoeller, his officers, agents, employees, and any persons in active concert or participation with them be restrained and enjoined from directly or indirectly transferring, selling, alienating, liquidating, converting, withdrawing, or otherwise disposing of any money or other of

Kunkemoeller's assets;

b) Damages, trebled according to 18 U.S.C. § 1964(c) for which all RICO Defendants are jointly and severally liable;

c) A finding of alter ego liability between Kunkemoeller and his controlled entities;

d) Pre-judgment interest;

e) Plaintiffs' reasonable attorneys' fees and costs according to 18 U.S.C. § 1964(c);

f) An accounting of Kunkemoeller's assets; and

g) Imposition of an equitable lien and constructive trust.

## <u>COUNT III: FEDERAL RICO (18 U.S.C. § 1962(c) & (d))</u>
### (Against Mary May)

211.    Plaintiffs incorporate by reference paragraphs 1 through 196 of this Complaint as if set forth in full.

212.    Mary May is a key member of the May Enterprise, an "association-in-fact" enterprise under RICO, 18 U.S.C. § 1961(4).   Mary May agreed to and did conduct and participate in the conduct of the May Enterprise's affairs through a pattern of racketeering activity in furtherance of the May Enterprise Scheme. Mary May directly benefitted from and assisted May in carrying out the illegal scheme to defraud Plaintiffs.

213.    In furtherance of the May Enterprise, Mary May engaged in at least two predicate acts within a ten-year period that constitute a pattern of "racketeering activities" under the Federal RICO statute, 18 U.S.C. § 1961(1).  These racketeering activities were aimed at intentionally defrauding the Plaintiffs of substantial sums of money, enriching the RICO

Defendants and others that may yet be unidentified, and concealing these activities. Specific predicate acts that Mary May engaged in include, but are not limited to, the following:

a.  In violation of 18 U.S.C. § 1343, at the direction of Mary May, Rearden Capital conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraphs 113 through 127; 129 through 131; 159 through 164; and 186.

b.  In violation of 18 U.S.C. § 1343, at the direction of Mary May, Leekca Properties conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraphs 153 through 158.

c.  In violation of 18 U.S.C. § 1343, at the direction of Mary May, Broadway Properties conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraph 163.

d.  In violation of 18 U.S.C. § 1343, at the direction of Mary May, Roosevelt Property conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraphs 150 through 153.

e.  In violation of 18 U.S.C. § 1343, at the direction of Mary May, 840 W. State St. conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraphs 32 and 175.

f.  In violation of 18 U.S.C. § 1343, at the direction of Mary May, Blue Victorian

Property conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraph 164.

g.  In violation of 18 U.S.C. § 1343, at the direction of Mary May, Crossburn Properties conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraphs 130 through 131; 151; and 153.

h.  In violation of 18 U.S.C. § 1343, at the direction of Mary May, Main Street Properties conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraph 162.

i.  In violation of 18 U.S.C. § 1343, at the direction of Mary May, Market Canton conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraphs 167 through 168.

j.  In violation of 18 U.S.C. § 1956, Mary May conducted or participated in financial transactions designed to disguise the nature, location, source, ownership, or control of proceeds from the Fraudulent Invoicing Scheme, including, but not limited to, those financial transactions identified in Paragraphs 69 through 99; 128 through 131; 146 through 172; and 173 through 176.

214.  Mary May unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c), as described

above, in violation of 18 U.S.C. § 1962(d).

215.     Upon information and belief, Mary May knew that she was engaged in a conspiracy to commit the predicate acts, and knew that the predicate acts were part of such racketeering activity, and her participation in each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

216.     As a direct and proximate result of Mary May's conspiracy, the overt acts taken in furtherance of that conspiracy, and the racketeering activities in violation of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property.

217.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover compensatory damages, treble damages, plus costs and attorney's fees, from Mary May and the other RICO Defendants.

WHEREFORE, Plaintiffs demand judgment against Mary May and relief as follows:

a)  An order that Mary May, her officers, agents, employees, and any persons in active concert or participation with them be restrained and enjoined from directly or indirectly transferring, selling, alienating, liquidating, converting, withdrawing, or otherwise disposing of any money or other of Mary May's assets;

b)  Damages, trebled according to 18 U.S.C. § 1964(c) for which all RICO Defendants are jointly and severally liable;

c)  A finding of alter ego liability between Mary May and her controlled entities, including the Morningwood Trust;

d)  Pre-judgment interest;

63

e)  Plaintiffs' reasonable attorneys' fees and costs according to 18 U.S.C. § 1964(c);

f)  An accounting of Mary May's assets; and

g)  Imposition of an equitable lien and constructive trust.

## COUNT IV: FEDERAL RICO (18 U.S.C. § 1962(c) & (d))
### (Against Susan M. Kunkemoeller)

218.    Plaintiffs incorporate by reference paragraphs 1 through 196 of this Complaint as if set forth in full.

219.    Susan Kunkemoeller is a key member of the May Enterprise, an "association-in-fact" enterprise under RICO, 18 U.S.C. § 1961(4).  Susan Kunkemoeller agreed to and did conduct and participate in the conduct of the May Enterprise's affairs through a pattern of racketeering activity in furtherance of the May Enterprise Scheme. Susan Kunkemoeller directly benefitted from and assisted May in carrying out the illegal scheme to defraud Plaintiffs.

220.    In furtherance of the May Enterprise, Susan Kunkemoeller engaged in at least two predicate acts within a ten-year period that constitute a pattern of "racketeering activities" under the Federal RICO statute, 18 U.S.C. § 1961(1).  These racketeering activities were aimed at intentionally defrauding the Plaintiffs of substantial sums of money, enriching the RICO Defendants and others that may yet be unidentified, and concealing these activities.  Specific predicate acts that Susan Kunkemoeller engaged in include, but are not limited to, the following:

a. In violation of 18 U.S.C. § 1343, Susan Kunkemoeller conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraphs 129 through 131; 146; 167 through 172.

b. In violation of 18 U.S.C. § 1956, Susan Kunkemoeller conducted or participated in financial transactions designed to disguise the nature, location, source, ownership, or control of proceeds from the Fraudulent Invoicing Scheme, including, but not limited to, those financial transactions identified in Paragraphs 69 through 99; 128 through 131; and 146 through 172.

221.   Susan Kunkemoeller unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c), as described above, in violation of 18 U.S.C. § 1962(d).

222.   Upon information and belief, Susan Kunkemoeller knew that she was engaged in a conspiracy to commit the predicate acts, and knew that the predicate acts were part of such racketeering activity, and her participation in each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

223.   As a direct and proximate result of Susan Kunkemoeller's conspiracy, the overt acts taken in furtherance of that conspiracy, and the racketeering activities in violation of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property.

224.   Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover compensatory damages, treble damages, plus costs and attorney's fees, from Susan Kunkemoeller and the other RICO Defendants.

WHEREFORE, Plaintiffs demand judgment against Susan Kunkemoeller and relief as follows:

a)  An order that Susan Kunkemoeller, her officers, agents, employees, and any persons in active concert or participation with them be restrained and enjoined from directly or indirectly transferring, selling, alienating, liquidating, converting, withdrawing, or otherwise disposing of any money or other of Susan Kunkemoeller's assets;

b)  Damages, trebled according to 18 U.S.C. § 1964(c) for which all RICO Defendants are jointly and severally liable;

c)  A finding of alter ego liability between Susan Kunkemoeller and her controlled entities, including the Susan M. Kunkemoeller Trust;

d)  Pre-judgment interest;

e)  Plaintiffs' reasonable attorneys' fees and costs according to 18 U.S.C. § 1964(c);

f)  An accounting of Susan Kunkemoeller's assets; and

g)  Imposition of an equitable lien and constructive trust.

## COUNT V: FEDERAL RICO (18 U.S.C. § 1962(c) & (d))
### (Against School Warehouse)

225.    Plaintiffs incorporate by reference paragraphs 1 through 196 of this Complaint as if set forth in full.

226.    School Warehouse is a member of the May Enterprise, an "association-in-fact" enterprise under RICO, 18 U.S.C. § 1961(4).  School Warehouse agreed to and did conduct

and participate in the conduct of the May Enterprise's affairs through a pattern of racketeering activity in furtherance of the May Enterprise Scheme.

227.     School Warehouse engaged in at least two predicate acts within a ten-year period that constitute a pattern of "racketeering activities" under the Federal RICO statute, 18 U.S.C. § 1961(1).  These racketeering activities were aimed at intentionally defrauding the Plaintiffs of substantial sums of money, enriching the RICO Defendants and others that may yet be unidentified, and concealing these activities.  Specific predicate acts that School Warehouse engaged in include, but are not limited to, the following:

    a.  In violation of 18 U.S.C. § 1341, School Warehouse, at the direction of Kunkemoeller, mailed the Plaintiffs fraudulent invoices that included items substantially marked up above costs as part of the Fraudulent Invoicing Scheme, including, but not limited to, those fraudulent invoices detailed in Paragraphs 74 through 99.

    b.  In violation of 18 U.S.C. § 1956, School Warehouse conducted or participated in financial transactions designed to disguise the nature, location, source, ownership, or control of proceeds from the Fraudulent Invoicing Scheme, including, but not limited to, those financial transactions identified in Paragraphs 69 through 99; 128 through 131; and 146 through 172.

228.     School Warehouse unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c), as described above, in violation of 18 U.S.C. § 1962(d).

229.     Upon information and belief, School Warehouse knew that it was engaged in a conspiracy to commit the predicate acts, and knew that the predicate acts were part of such

racketeering activity, and its participation in each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

230.     As a direct and proximate result of School Warehouse's conspiracy, the overt acts taken in furtherance of that conspiracy, and the racketeering activities in violation of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property.

231.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover compensatory damages, treble damages, plus costs and attorney's fees, from School Warehouse and the other RICO Defendants.

WHEREFORE, Plaintiffs demand judgment against School Warehouse and relief as follows:

a) An order that School Warehouse, its officers, agents, employees, and any persons in active concert or participation with them be restrained and enjoined from directly or indirectly transferring, selling, alienating, liquidating, converting, withdrawing, or otherwise disposing of any money or other of School Warehouse's assets;

b) Damages, trebled according to 18 U.S.C. § 1964(c) for which all RICO Defendants are jointly and severally liable;

c) A finding of alter ego liability between School Warehouse and its controlled entities;

d) Pre-judgment interest;

e) Plaintiffs' reasonable attorneys' fees and costs according to 18 U.S.C. § 1964(c);

f)   An accounting of School Warehouse's assets; and

g)   Imposition of an equitable lien and constructive trust.

## COUNT VI: FEDERAL RICO (18 U.S.C. § 1962(c) & (d))
### (Against Newpoint Education Partners)

232.   Plaintiffs incorporate by reference paragraphs 1 through 196 of this Complaint as if set forth in full.

233.   Newpoint Education Partners is a member of the May Enterprise, an "association-in-fact" enterprise under RICO, 18 U.S.C. § 1961(4).   Newpoint Education Partners agreed to and did conduct and participate in the conduct of the May Enterprise's affairs through a pattern of racketeering activity in furtherance of the May Enterprise Scheme.

234.   Newpoint Education Partners engaged in at least two predicate acts within a ten-year period that constitute a pattern of "racketeering activities" under the Federal RICO statute, 18 U.S.C. § 1961(1).   These racketeering activities were aimed at intentionally defrauding the Plaintiffs of substantial sums of money, enriching the RICO Defendants and others that may yet be unidentified, and concealing these activities.   Specific predicate acts that Newpoint Education Partners engaged in include, but are not limited to, the following:

a.   In violation of 18 U.S.C. § 1341, at the direction of May, Newpoint Education Partners mailed the Plaintiffs fraudulent invoices that included items substantially marked up above costs as part of the Fraudulent Invoicing Scheme, including, but not limited to, those fraudulent invoices detailed in Paragraphs 69 through 99.

b.   In violation of 18 U.S.C. § 1343, Newpoint Education Partners engaged in various email communications with Apex Learning, wherein Newpoint

Education Partners devised a scheme or artifice to defraud the Plaintiffs of substantial sums of money through the Fraudulent Apex Rebate Scheme and negotiated with Apex Learning the terms of the scheme or artifice, including, but not limited to, those communications described in Paragraphs 111 through 127.

c.  In violation of 18 U.S.C. § 1956, Newpoint Education Partners conducted or participated in financial transactions through wire of proceeds from the Fraudulent Invoice Scheme, including, but not limited to those financial transactions described in Paragraphs 69 through 99; 128 through 131; and 146 through 172.

235.    Newpoint Education Partners unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c), as described above, in violation of 18 U.S.C. § 1962(d).

236.    Upon information and belief, Newpoint Education Partners knew that it was engaged in a conspiracy to commit the predicate acts, and knew that the predicate acts were part of such racketeering activity, and its participation in each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

237.    As a direct and proximate result of Newpoint Education Partners' conspiracy, the overt acts taken in furtherance of that conspiracy, and the racketeering activities in violation of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property.

238.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover compensatory damages, treble damages, plus costs and attorney's fees, from Newpoint Education Partners

and the other RICO Defendants.

WHEREFORE, Plaintiffs demand judgment against Newpoint Education Partners and relief as follows:

a) An order that Newpoint Education Partners, its officers, agents, employees, and any persons in active concert or participation with them be restrained and enjoined from directly or indirectly transferring, selling, alienating, liquidating, converting, withdrawing, or otherwise disposing of any money or other of Newpoint Education Partners' assets;

b) Damages, trebled according to 18 U.S.C. § 1964(c) for which all RICO Defendants are jointly and severally liable;

c) A finding of alter ego liability between Newpoint Education Partners and its controlled entities;

d) Pre-judgment interest;

e) Plaintiffs' reasonable attorneys' fees and costs according to 18 U.S.C. § 1964(c);

f) An accounting of Newpoint Education Partners' assets; and

g) Imposition of an equitable lien and constructive trust.

## <u>COUNT VII: FEDERAL RICO (18 U.S.C. § 1962(c) & (d))</u>
### (Against Cambridge Education Group)

239.   Plaintiffs incorporate by reference paragraphs 1 through 196 of this Complaint as if set forth in full.

240.   Cambridge Education Group is a member of the May Enterprise, an "association-in-fact" enterprise under RICO, 18 U.S.C. § 1961(4).   Cambridge Education

Group agreed to and did conduct and participate in the conduct of the May Enterprise's affairs through a pattern of racketeering activity in furtherance of the May Enterprise Scheme.

241.     Cambridge Education Group engaged in at least two predicate acts within a ten-year period that constitute a pattern of "racketeering activities" under the Federal RICO statute, 18 U.S.C. § 1961(1).  These racketeering activities were aimed at intentionally defrauding the Plaintiffs of substantial sums of money, enriching the RICO Defendants and others that may yet be unidentified, and concealing these activities.  Specific predicate acts that Cambridge Education Group engaged in include, but are not limited to, the following:

   a.   In violation of 18 U.S.C. § 1343, May, on behalf of Cambridge Education Group, engaged in various email communications with Apex Learning, where he devised a scheme or artifice to defraud the Plaintiffs of substantial sums of money through the Fraudulent Apex Rebate Scheme and negotiated with Apex Learning the terms of the scheme or artifice, including, but not limited to, those communications described in Paragraphs 111 through 127.

   b.   In violation of 18 U.S.C. § 1343, May, on behalf of Cambridge Education Group, directed Apex Learning to transmit to Rearden Capital fraudulent kickbacks disguised as "rebates" derived from the Fraudulent Apex Rebate Scheme through wire or other means, as described in Paragraphs 179 through 183.

   c.   In violation of 18 U.S.C. § 1956, Cambridge Education Group conducted or participated in financial transactions designed to disguise the nature, location, source, ownership, or control of proceeds derived from the Fraudulent Invoicing Scheme and other component schemes of the May Enterprise Scheme,

including, but not limited to, those financial transactions identified in Paragraphs 69 through 99; 128 through 131; and 146 through 172.

242.    Cambridge Education Group unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c), as described above, in violation of 18 U.S.C. § 1962(d).

243.    Upon information and belief, Cambridge Education Group knew that it was engaged in a conspiracy to commit the predicate acts, and knew that the predicate acts were part of such racketeering activity, and its participation in each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

244.    As a direct and proximate result of Cambridge Education Group's conspiracy, the overt acts taken in furtherance of that conspiracy, and the racketeering activities in violation of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property.

245.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover compensatory damages, treble damages, plus costs and attorney's fees, from Cambridge Education Group and the other RICO Defendants.

WHEREFORE, Plaintiffs demand judgment against Cambridge Education Group and relief as follows:

a)   An order that Cambridge Education Group, its officers, agents, employees, and any persons in active concert or participation with them be restrained and enjoined from directly or indirectly transferring, selling, alienating, liquidating, converting, withdrawing, or otherwise disposing of any money or other of Cambridge Education Group's assets;

b) Damages, trebled according to 18 U.S.C. § 1964(c) for which all RICO Defendants are jointly and severally liable;

c) A finding of alter ego liability between Cambridge Education Group and its controlled entities, including Newpoint Education Partners;

d) A finding of alter ego liability between Cambridge Education Group and its controlled entities;

e) Pre-judgment interest;

f) Plaintiffs' reasonable attorneys' fees and costs according to 18 U.S.C. § 1964(c);

g) An accounting of Cambridge Education Group's assets; and

h) Imposition of an equitable lien and constructive trust.

## COUNT VIII: FEDERAL RICO (18 U.S.C. § 1962(c) & (d))
### (Against Solo Products)

246. Plaintiffs incorporate by reference paragraphs 1 through 196 of this Complaint as if set forth in full.

247. Solo Products is a member of the May Enterprise, an "association-in-fact" enterprise under RICO, 18 U.S.C. § 1961(4). Solo Products agreed to and did conduct and participate in the conduct of the May Enterprise's affairs through a pattern of racketeering activity in furtherance of the May Enterprise Scheme.

248. Solo Products engaged in at least two predicate acts within a ten-year period that constitute a pattern of "racketeering activities" under the Federal RICO statute, 18 U.S.C. § 1961(1). These racketeering activities were aimed at intentionally defrauding the Plaintiffs of substantial sums of money, enriching the RICO Defendants and others that may yet be

74

unidentified, and concealing these activities.   Specific predicate acts that Solo Products engaged in include, but are not limited to, the following:

  a. In violation of 18 U.S.C. § 1956, Solo Products conducted or participated in financial transactions designed to disguise the nature, location, source, ownership, or control of proceeds from the Fraudulent Invoicing Scheme, including, but not limited to, those financial transactions identified in Paragraphs 69 through 99; 128 through 131; and 146 through 172.

249. Solo Products unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c), as described above, in violation of 18 U.S.C. § 1962(d).

250. Upon information and belief, Solo Products knew that it was engaged in a conspiracy to commit the predicate acts, and knew that the predicate acts were part of such racketeering activity, and its participation in each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

251. As a direct and proximate result of Solo Products' conspiracy, the overt acts taken in furtherance of that conspiracy, and the racketeering activities in violation of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property.

252. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover compensatory damages, treble damages, plus costs and attorney's fees, from Solo Products and the other RICO Defendants.

WHEREFORE, Plaintiffs demand judgment against Solo Products and relief as follows:

a)  An order that Solo Products, its officers, agents, employees, and any persons in active concert or participation with them be restrained and enjoined from directly or indirectly transferring, selling, alienating, liquidating, converting, withdrawing, or otherwise disposing of any money or other of Solo Products' assets;

b)  Damages, trebled according to 18 U.S.C. § 1964(c) for which all RICO Defendants are jointly and severally liable;

c)  A finding of alter ego liability between Solo Products and its controlled entities;

d)  Pre-judgment interest;

e)  Plaintiffs' reasonable attorneys' fees and costs according to 18 U.S.C. § 1964(c);

f)  An accounting of Solo Products' assets; and

g)  Imposition of an equitable lien and constructive trust.

### COUNT IX: FEDERAL RICO (18 U.S.C. § 1962(c) & (d))
### (Against Direct Store Delivery)

253.    Plaintiffs incorporate by reference paragraphs 1 through 196 of this Complaint as if set forth in full.

254.    Direct Store Delivery is a member of the May Enterprise, an "association-in-fact" enterprise under RICO, 18 U.S.C. § 1961(4).  Direct Store Delivery agreed to and did conduct and participate in the conduct of the May Enterprise's affairs through a pattern of

racketeering activity in furtherance of the May Enterprise Scheme.

255.     Direct Store Delivery engaged in at least two predicate acts within a ten-year period that constitute a pattern of "racketeering activities" under the Federal RICO statute, 18 U.S.C. § 1961(1).  These racketeering activities were aimed at intentionally defrauding the Plaintiffs of substantial sums of money, enriching the RICO Defendants and others that may yet be unidentified, and concealing these activities.  Specific predicate acts that Direct Store Delivery engaged in include, but are not limited to, the following:

   a.  In violation of 18 U.S.C. § 1956, Direct Store Delivery conducted or participated in financial transactions designed to disguise the nature, location, source, ownership, or control of proceeds from the Fraudulent Invoicing Scheme, including, but not limited to, those financial transactions identified in Paragraphs 69 through 99; 128 through 131; and 146 through 172.

256.     Direct Store Delivery unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c), as described above, in violation of 18 U.S.C. § 1962(d).

257.     Upon information and belief, Direct Store Delivery knew that it was engaged in a conspiracy to commit the predicate acts, and knew that the predicate acts were part of such racketeering activity, and its participation in each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

258.     As a direct and proximate result of Direct Store Delivery's conspiracy, the overt acts taken in furtherance of that conspiracy, and the racketeering activities in violation of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property.

77

259.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover compensatory damages, treble damages, plus costs and attorney's fees, from Direct Store Delivery and the other RICO Defendants.

WHEREFORE, Plaintiffs demand judgment against Direct Store Delivery and relief as follows:

a)   An order that Direct Store Delivery, its officers, agents, employees, and any persons in active concert or participation with them be restrained and enjoined from directly or indirectly transferring, selling, alienating, liquidating, converting, withdrawing, or otherwise disposing of any money or other of Direct Store Delivery's assets;

b)   Damages, trebled according to 18 U.S.C. § 1964(c) for which all RICO Defendants are jointly and severally liable;

c)   A finding of alter ego liability between Direct Store Delivery and its controlled entities;

d)   Pre-judgment interest;

e)   Plaintiffs' reasonable attorneys' fees and costs according to 18 U.S.C. § 1964(c);

f)   An accounting of Direct Store Delivery's assets; and

g)   Imposition of an equitable lien and constructive trust.

## <u>COUNT X: FEDERAL RICO (18 U.S.C. § 1962(c) & (d))</u>
### (Against Red Ignition, LLC)

260.     Plaintiffs incorporate by reference paragraphs 1 through 196 of this Complaint as if set forth in full.

261.     Red Ignition, LLC, is a member of the May Enterprise, an "association-in-fact" enterprise under RICO, 18 U.S.C. § 1961(4).  Red Ignition, LLC, agreed to and did conduct and participate in the conduct of the May Enterprise's affairs through a pattern of racketeering activity in furtherance of the May Enterprise Scheme.

262.     Red Ignition, LLC, engaged in at least two predicate acts within a ten-year period that constitute a pattern of "racketeering activities" under the Federal RICO statute, 18 U.S.C. § 1961(1).  These racketeering activities were aimed at intentionally defrauding the Plaintiffs of substantial sums of money, enriching the RICO Defendants and others that may yet be unidentified, and concealing these activities.  Specific predicate acts that Red Ignition, LLC, engaged in include, but are not limited to, the following:

    a.   In violation of 18 U.S.C. § 1341, Red Ignition, LLC, at the direction of May, mailed Palm Bay Education fraudulent invoices that included items substantially marked up above costs as part of the Fraudulent Invoicing Scheme, including, but not limited to, those fraudulent invoices detailed in Paragraphs 59; 75; 69 through 99; and 105 through 106.

    b.   In violation of 18 U.S.C. § 1956, Red Ignition conducted or participated in financial transactions designed to disguise the nature, location, source, ownership, or control of proceeds from the Fraudulent Invoicing Scheme, including, but not limited to, those financial transactions identified in

Paragraphs 69 through 99; 128 through 131; 146 through 172; and 185.

263.     Red Ignition, LLC, unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c), as described above, in violation of 18 U.S.C. § 1962(d).

264.     Upon information and belief, Red Ignition, LLC, knew that it was engaged in a conspiracy to commit the predicate acts, and knew that the predicate acts were part of such racketeering activity, and its participation in each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

265.     As a direct and proximate result of Red Ignition, LLC's, conspiracy, the overt acts taken in furtherance of that conspiracy, and the racketeering activities in violation of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property.

266.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover compensatory damages, treble damages, plus costs and attorney's fees, from Red Ignition, LLC, and the other RICO Defendants.

WHEREFORE, Plaintiffs demand judgment against Red Ignition, LLC, and relief as follows:

a)   An order that Red Ignition, LLC, its officers, agents, employees, and any persons in active concert or participation with them be restrained and enjoined from directly or indirectly transferring, selling, alienating, liquidating, converting, withdrawing, or otherwise disposing of any money or other of Red Ignition, LLC's, assets;

b)   Damages, trebled according to 18 U.S.C. § 1964(c) for which all RICO

Defendants are jointly and severally liable;

c) A finding of alter ego liability between Red Ignition, LLC, and its controlled entities;

d) Pre-judgment interest;

e) Plaintiffs' reasonable attorneys' fees and costs according to 18 U.S.C. § 1964(c);

f) An accounting of Red Ignition, LLC's, assets; and

g) Imposition of an equitable lien and constructive trust.

### COUNT XI: FEDERAL RICO (18 U.S.C. § 1962(c) & (d))
### (Against Rearden Capital)

267.    Plaintiffs incorporate by reference paragraphs 1 through 196 of this Complaint as if set forth in full.

268.    Rearden Capital is a member of the May Enterprise, an "association-in-fact" enterprise under RICO, 18 U.S.C. § 1961(4).  Rearden Capital agreed to and did conduct and participate in the conduct of the May Enterprise's affairs through a pattern of racketeering activity in furtherance of the May Enterprise Scheme.

269.    Rearden Capital engaged in at least two predicate acts within a ten-year period that constitute a pattern of "racketeering activities" under the Federal RICO statute, 18 U.S.C. § 1961(1).  These racketeering activities were aimed at intentionally defrauding the Plaintiffs of substantial sums of money, enriching the RICO Defendants and others that may yet be unidentified, and concealing these activities.  Specific predicate acts that Rearden Capital engaged in include, but are not limited to, the following:

a.  In violation of 18 U.S.C. § 1956, Rearden Capital conducted or participated in financial transactions designed to disguise the nature, location, source, ownership, or control of proceeds from the Fraudulent Invoicing Scheme, including, but not limited to, those financial transactions identified in Paragraphs 69 through 99; 128 through 131; 146 through 172; and 185.

270.    Rearden Capital unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c), as described above, in violation of 18 U.S.C. § 1962(d).

271.    Upon information and belief, Rearden Capital knew that it was engaged in a conspiracy to commit the predicate acts, and knew that the predicate acts were part of such racketeering activity, and its participation in each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

272.    As a direct and proximate result of Rearden Capital's conspiracy, the overt acts taken in furtherance of that conspiracy, and the racketeering activities in violation of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property.

273.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover compensatory damages, treble damages, plus costs and attorney's fees, from Rearden Capital and the other RICO Defendants.

WHEREFORE, Plaintiffs demand judgment against Rearden Capital and relief as follows:

a)  An order that Rearden Capital, its officers, agents, employees, and any persons in active concert or participation with them be restrained and enjoined

from directly or indirectly transferring, selling, alienating, liquidating, converting, withdrawing, or otherwise disposing of any money or other of Rearden Capital's assets;

b) Damages, trebled according to 18 U.S.C. § 1964(c) for which all RICO Defendants are jointly and severally liable;

c) A finding of alter ego liability between Rearden Capital and its controlled entities;

d) Pre-judgment interest;

e) Plaintiffs' reasonable attorneys' fees and costs according to 18 U.S.C. § 1964(c);

f) An accounting of Rearden Capital's assets; and

g) Imposition of an equitable lien and constructive trust.

### COUNT XII: FLORIDA RICO (Sections 772.103 & 895.03, Florida Statutes)
**(Against Marcus May)**

274. Plaintiffs incorporate by reference paragraphs 1 through 196 of this Complaint as if set forth in full.

275. May is a member of the May Enterprise, an "association-in-fact" enterprise under sections 772.102(3) and 895.02(3), Florida Statutes. May was the principal architect of the May Enterprise and participated in the affairs of the May Enterprise through a pattern of racketeering activity in furtherance of the May Enterprise Scheme.

276. May engaged in at least two predicate acts within a ten-year period that constitute a pattern of "racketeering activities" under the Florida Civil Remedies for Criminal Practices Act, section 772.102, Florida Statutes, and Florida RICO, section 895.02, Florida

Statutes. These racketeering activities were aimed at intentionally defrauding the Plaintiffs of substantial sums of money, enriching the RICO Defendants and others that may yet be unidentified, and concealing these activities.

    a.  In violation of section 817.034, Florida Statutes, at the direction of May, Red Ignition, LLC, mailed Palm Bay Education fraudulent invoices that included items substantially marked up above costs as part of the Fraudulent Invoicing Scheme, including, but not limited to, those fraudulent invoices detailed in Paragraphs 86 through 88.

    b.  In violation of section 817.034, Florida Statutes, at the direction of May, School Warehouse mailed the Plaintiffs fraudulent invoices that included items substantially marked up above costs as part of the Fraudulent Invoicing Scheme, including, but not limited to, those fraudulent invoices detailed in Paragraphs 74 through 99.

    c.  In violation of section 817.034, Florida Statutes, at the direction of May, Newpoint Education Partners mailed the Plaintiffs fraudulent invoices that included items substantially marked up above costs as part of the Fraudulent Invoicing Scheme, including, but not limited to, those fraudulent invoices detailed in Paragraphs 69 through 99.

    d.  In violation of section 817.034, Florida Statutes, May engaged in various email communications with Apex Learning, where he devised a scheme or artifice to defraud the Plaintiffs of substantial sums of money through the Fraudulent Apex Rebate Scheme and negotiated with Apex Learning the terms of the scheme or artifice, including, but not limited to, those communications described in

Paragraphs 108 through 127.

e.  In violation of section 817.034, Florida Statutes, May directed Apex Learning to transmit to Rearden Capital fraudulent kickbacks disguised as "rebates" derived from the Fraudulent Apex Rebate Scheme through wire or other means, as described in Paragraphs 111 through 117.

f.  In violation of section 817.034, Florida Statutes, at the direction of May, Rearden Capital conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraphs 113 through 127; 129 through 131; 159 through 164; and 186.

g.  In violation of section 817.034, Florida Statutes, at the direction of May, Leekca Properties conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraphs 153 through 158.

h.  In violation of section 817.034, Florida Statutes, at the direction of May, Broadway Properties conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraph 163.

i.  In violation of section 817.034, Florida Statutes, at the direction of May, Roosevelt Property conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraphs 150 and 153.

j.  In violation of section 817.034, Florida Statutes, at the direction of May, 840 W. State St. conducted or participated in financial transactions through wire of

85

proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraphs 32 and 175.

k. In violation of section 817.034, Florida Statutes, at the direction of May, Blue Victorian Property conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraph 164.

l. In violation of section 817.034, Florida Statutes, at the direction of May, Crossburn Properties conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraphs 130; 151; and 153.

m. In violation of section 817.034, Florida Statutes, at the direction of May, Main Street Properties conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraph 162.

n. In violation of section 817.034, Florida Statutes, at the direction of May, Market Canton conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraphs 167 through 168.

o. In violation of section 896.101, Florida Statutes, May conducted or participated in financial transactions designed to disguise the nature, location, source, ownership, or control of proceeds derived from the Fraudulent Invoicing Scheme and other component schemes of the May Enterprise Scheme, including, but not limited to, those financial transactions identified in

Paragraphs 69 through 99; 128 through 131; 146 through 172; and 173 through 176.

277.     On November 13, 2018, May was found guilty of two counts of violating Florida RICO, section 895.03, Florida Statutes, and one count of violating the Florida Communications Fraud Act, section 817.043, Florida Statutes.

278.     May unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate sections 772.103(3) and 895.03(3), Florida Statutes, as described above, in violation of sections 772.103(4) and 895.03(4), Florida Statutes.

279.     Upon information and belief, May knew that he was engaged in a conspiracy to commit the predicate acts, and knew that the predicate acts were part of such racketeering activity, and his participation in each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate sections 772.103(3) and 895.03(3), Florida Statutes, in violation of sections 772.103(4) and 895.03(4), Florida Statutes.

280.     As a direct and proximate result of May's conspiracy, the overt acts taken in furtherance of that conspiracy, and the racketeering activities in violation of sections 772.103(3) and 895.03(3), Florida Statutes, Plaintiffs have been injured in their business and property.

281.     Pursuant to section 772.104(1), Plaintiffs are entitled to treble damages plus costs and attorneys' fees from May.

282.     Pursuant to sections 895.05(1) and (6), Florida Statutes, Plaintiffs are entitled to an injunction preventing May from committing further violations of section 895.03, Florida

Statutes.

WHEREFORE, Plaintiffs demand judgment against May and relief as follows:

a)  An order that May, his officers, agents, employees, and any persons in active concert or participation with them be restrained and enjoined from directly or indirectly transferring, selling, alienating, liquidating, converting, withdrawing, or otherwise disposing of any money or other of May's assets;

b)  Damages, trebled according to section 772.104, Florida Statutes for which all RICO Defendants are jointly and severally liable;

c)  Entry of an injunction preventing May from committing further violations of section 895.03, Florida Statutes;

d)  A finding of alter ego liability between May and his controlled entities;

e)  Pre-judgment interest;

f)  Plaintiffs' reasonable attorneys' fees and costs according to section 772.104, Florida Statutes;

g)  An accounting of May's assets; and

h)  Imposition of an equitable lien and constructive trust.

## COUNT XIII: FLORIDA RICO (Sections 772.103 & 895.03, Florida Statutes)
### (Against Steven Kunkemoeller)

283.     Plaintiffs incorporate by reference paragraphs 1 through 196 of this Complaint as if set forth in full.

284.     Kunkemoeller is a member of the May Enterprise, an "association-in-fact" enterprise under sections 772.102(3) and 895.02(3), Florida Statutes.  Kunkemoeller agreed to and did conduct and participate in the conduct of the May Enterprise's affairs through a pattern

of racketeering activity in furtherance of the May Enterprise Scheme.

285.     Kunkemoeller engaged in at least two predicate acts within a ten-year period that constitute a pattern of "racketeering activities" under the Florida Civil Remedies for Criminal Practices Act, section 772.102, Florida Statutes, and Florida RICO, section 895.02, Florida Statutes.   These racketeering activities were aimed at intentionally defrauding the Plaintiffs of substantial sums of money, enriching the RICO Defendants and others that may yet be unidentified, and concealing these activities.   Specific predicate acts that Kunkemoeller engaged in include, but are not limited to, the following:

   a.   In violation of section 817.034, Florida Statutes, at the direction of Kunkemoeller, School Warehouse mailed the Plaintiffs fraudulent invoices that included items substantially marked up above costs as part of the Fraudulent Invoicing Scheme, including, but not limited to, those fraudulent invoices detailed in Paragraphs 74 through 99.

   b.   In violation of section 817.034, Florida Statutes, at the direction of Kunkemoeller, Direct Store Delivery conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraphs 128 through 131; 150; 158; and 188.

   c.   In violation of section 817.034, Florida Statutes, at the direction of Kunkemoeller, Solo Products conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraphs 76; 129 through 131; 151; 170; and 187.

   d.   In violation of section 817.034, Florida Statutes, at the direction of Kunkemoeller, Red Ignition, LLC, conducted or participated in financial

transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraphs 75; 87 through 88; 105 through 106; 129 through 131; and 185.

e.  In violation of section 817.034, Florida Statutes, at the direction of Kunkemoeller, Market Canton conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraphs 167 through 168.

f.  In violation of section 817.034, Florida Statutes, at the direction of Kunkemoeller, Crossburn Properties conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraphs 129 through 131; 151; and 153.

g.  In violation of section 896.101, Florida Statutes, Kunkemoeller conducted or participated in financial transactions designed to disguise the nature, location, source, ownership, or control of proceeds from the Fraudulent Invoicing Scheme, including, but not limited to, those financial transactions identified in Paragraphs 69 through 99; 128 through 131; and 146 through 172.

286.  On May 18, 2018, Kunkemoeller was found guilty of one count of violating Florida RICO, section 895.03, Florida Statutes, and one count of violating the Florida Communications Fraud Act, section 817.043, Florida Statutes.

287.  Kunkemoeller unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate sections 772.103(3) and 895.03(3), Florida Statutes, as described above, in violation of sections 772.103(4) and 895.03(4), Florida Statutes.

288.     Upon information and belief, Kunkemoeller knew that he was engaged in a conspiracy to commit the predicate acts, and knew that the predicate acts were part of such racketeering activity, and his participation in each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate sections 772.103(3) and 895.03(3), Florida Statutes, in violation of sections 772.103(4) and 895.03(4), Florida Statutes.

289.     As a direct and proximate result of Kunkemoeller's conspiracy, the overt acts taken in furtherance of that conspiracy, and the racketeering activities in violation of sections 772.103(3) and 895.03(3), Florida Statutes, Plaintiffs have been injured in their business and property.

290.     Pursuant to section 772.104(1), Plaintiffs are entitled to treble damages plus costs and attorneys' fees from Kunkemoeller.

291.     Pursuant to sections 895.05(1) and (6), Florida Statutes, Plaintiffs are entitled to an injunction preventing Kunkemoeller from committing further violations of section 895.03, Florida Statutes.

WHEREFORE, Plaintiffs demand judgment against Kunkemoeller and relief as follows:

    a) An order that Kunkemoeller, his officers, agents, employees, and any persons in active concert or participation with them be restrained and enjoined from directly or indirectly transferring, selling, alienating, liquidating, converting, withdrawing, or otherwise disposing of any money or other of Kunkemoeller's assets;

    b) Damages, trebled according to section 772.104, Florida Statutes for which all

RICO Defendants are jointly and severally liable;

c) Entry of an injunction preventing Kunkemoeller from committing further violations of section 895.03, Florida Statutes;

d) A finding of alter ego liability between Kunkemoeller and his controlled entities;

e) Pre-judgment interest;

f) Plaintiffs' reasonable attorneys' fees and costs according to section 772.104, Florida Statutes;

g) An accounting of Kunkemoeller's assets; and

h) Imposition of an equitable lien and constructive trust.

## COUNT XIV: FLORIDA RICO (Sections 772.103 & 895.03, Florida Statutes)
### (Against Mary May)

292.    Plaintiffs incorporate by reference paragraphs 1 through 196 of this Complaint as if set forth in full.

293.    Mary May is a member of the May Enterprise, an "association-in-fact" enterprise under sections 772.102(3) and 895.02(3), Florida Statutes.  Mary May agreed to and did conduct and participate in the conduct of the May Enterprise's affairs through a pattern of racketeering activity in furtherance of the May Enterprise Scheme.

294.    Mary May engaged in at least two predicate acts within a ten-year period that constitute a pattern of "racketeering activities" under the Florida Civil Remedies for Criminal Practices Act, section 772.102, Florida Statutes, and Florida RICO, section 895.02, Florida Statutes.  These racketeering activities were aimed at intentionally defrauding the Plaintiffs of substantial sums of money, enriching the RICO Defendants and others that may yet be

unidentified, and concealing these activities.  Specific predicate acts that Mary May engaged in include, but are not limited to, the following:

a.  In violation of section 817.034, Florida Statutes, at the direction of Mary May, Rearden Capital conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraphs 113 through 127; 129 through 131; 159 through 164; and 186.

b.  In violation of section 817.034, Florida Statutes, at the direction of Mary May, Leekca Properties conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraphs 153 through 158.

c.  In violation of section 817.034, Florida Statutes, at the direction of Mary May, Broadway Properties conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraph 163.

d.  In violation of section 817.034, Florida Statutes, at the direction of Mary May, Roosevelt Property conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraphs 150 through 153.

e.  In violation of section 817.034, Florida Statutes, at the direction of Mary May, 840 W. State St. conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraphs 32 and 175.

f.  In violation of section 817.034, Florida Statutes, at the direction of Mary May,

Blue Victorian Property conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraph 164.

g.  In violation of section 817.034, Florida Statutes, at the direction of Mary May, Crossburn Properties conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraphs 130 through 131; 151; and 153.

h.  In violation of section 817.034, Florida Statutes, at the direction of Mary May, Main Street Properties conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraph 162.

i.  In violation of section 817.034, Florida Statutes, at the direction of Mary May, Market Canton conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraphs 167 through 168.

j.  In violation of section 896.101, Florida Statutes, Mary May conducted or participated in financial transactions designed to disguise the nature, location, source, ownership, or control of proceeds from the Fraudulent Invoicing Scheme, including, but not limited to, those financial transactions identified in Paragraphs 69 through 99; 128 through 131; 146 through 172; and 173 through 176.

295.  Mary May unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate sections 772.103(3) and 895.03(3),

Florida Statutes, as described above, in violation of sections 772.103(4) and 895.03(4), Florida Statutes.

296.     Upon information and belief, Mary May knew that she was engaged in a conspiracy to commit the predicate acts, and knew that the predicate acts were part of such racketeering activity, and her participation in each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate sections 772.103(3) and 895.03(3), Florida Statutes, in violation of sections 772.103(4) and 895.03(4), Florida Statutes.

297.     As a direct and proximate result of Mary May's conspiracy, the overt acts taken in furtherance of that conspiracy, and the racketeering activities in violation of sections 772.103(3) and 895.03(3), Florida Statutes, Plaintiffs have been injured in their business and property.

298.     Pursuant to section 772.104(1), Plaintiffs are entitled to treble damages plus costs and attorneys' fees from Mary May.

299.     Pursuant to sections 895.05(1) and (6), Florida Statutes, Plaintiffs are entitled to an injunction preventing Mary May from committing further violations of section 895.03, Florida Statutes.

WHEREFORE, Plaintiffs demand judgment against Mary May and relief as follows:

   a)  An order that Mary May, her officers, agents, employees, and any persons in active concert or participation with them be restrained and enjoined from directly or indirectly transferring, selling, alienating, liquidating, converting, withdrawing, or otherwise disposing of any money or other of Mary May's assets;

b)  Damages, trebled according to section 772.104, Florida Statutes for which all RICO Defendants are jointly and severally liable;

c)  Entry of an injunction preventing Mary May from committing further violations of section 895.03, Florida Statutes;

d)  A finding of alter ego liability between Mary May and her controlled entities, including the Morningwood Trust;

e)  Pre-judgment interest;

f)  Plaintiffs' reasonable attorneys' fees and costs according to section 772.104, Florida Statutes;

g)  An accounting of Mary May's assets; and

h)  Imposition of an equitable lien and constructive trust.

## COUNT XV: FLORIDA RICO (Sections 772.103 & 895.03, Florida Statutes)
### (Against Susan M. Kunkemoeller)

300.    Plaintiffs incorporate by reference paragraphs 1 through 196 of this Complaint as if set forth in full.

301.    Susan Kunkemoeller is a member of the May Enterprise, an "association-in-fact" enterprise under sections 772.102(3) and 895.02(3), Florida Statutes.    Susan Kunkemoeller agreed to and did conduct and participate in the conduct of the May Enterprise's affairs through a pattern of racketeering activity in furtherance of the May Enterprise Scheme.

302.    Susan Kunkemoeller engaged in at least two predicate acts within a ten-year period that constitute a pattern of "racketeering activities" under the Florida Civil Remedies for Criminal Practices Act, section 772.102, Florida Statutes, and Florida RICO, section 895.02, Florida Statutes.  These racketeering activities were aimed at intentionally defrauding

the Plaintiffs of substantial sums of money, enriching the RICO Defendants and others that may yet be unidentified, and concealing these activities.  Specific predicate acts that Susan Kunkemoeller engaged in include, but are not limited to, the following:

    a.   In violation of section 817.034, Florida Statutes, Susan Kunkemoeller conducted or participated in financial transactions through wire of proceeds derived from the Fraudulent Invoicing Scheme, as described in Paragraphs 129 through 131; 146; 167 through 172.

    b.   In violation of section 896.101, Florida Statutes, Susan Kunkemoeller conducted or participated in financial transactions designed to disguise the nature, location, source, ownership, or control of proceeds from the Fraudulent Invoicing Scheme, including, but not limited to, those financial transactions identified in Paragraphs 69 through 99; 128 through 131; and 146 through 172.

303.    Susan Kunkemoeller unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate sections 772.103(3) and 895.03(3), Florida Statutes, as described above, in violation of sections 772.103(4) and 895.03(4), Florida Statutes.

304.    Upon information and belief, Susan Kunkemoeller knew that she was engaged in a conspiracy to commit the predicate acts, and knew that the predicate acts were part of such racketeering activity, and her participation in each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate sections 772.103(3) and 895.03(3), Florida Statutes, in violation of sections 772.103(4) and 895.03(4), Florida Statutes.

305.     As a direct and proximate result of Susan Kunkemoeller's conspiracy, the overt acts taken in furtherance of that conspiracy, and the racketeering activities in violation of sections 772.103(3) and 895.03(3), Florida Statutes, Plaintiffs have been injured in their business and property.

306.     Pursuant to section 772.104(1), Plaintiffs are entitled to treble damages plus costs and attorneys' fees from Susan Kunkemoeller.

307.     Pursuant to sections 895.05(1) and (6), Florida Statutes, Plaintiffs are entitled to an injunction preventing Susan Kunkemoeller from committing further violations of section 895.03, Florida Statutes.

WHEREFORE, Plaintiffs demand judgment against Susan Kunkemoeller and relief as follows:

a)  An order that Susan Kunkemoeller, her officers, agents, employees, and any persons in active concert or participation with them be restrained and enjoined from directly or indirectly transferring, selling, alienating, liquidating, converting, withdrawing, or otherwise disposing of any money or other of Susan Kunkemoeller's assets;

b)  Damages, trebled according to section 772.104, Florida Statutes for which all RICO Defendants are jointly and severally liable;

c)  Entry of an injunction preventing Susan Kunkemoeller from committing further violations of section 895.03, Florida Statutes;

d)  A finding of alter ego liability between Susan Kunkemoeller and her controlled entities, including the Susan M. Kunkemoeller Trust;

e)  Pre-judgment interest;

f) Plaintiffs' reasonable attorneys' fees and costs according to section 772.104, Florida Statutes;

g) An accounting of Susan Kunkemoeller's assets; and

h) Imposition of an equitable lien and constructive trust.

## COUNT XVI: FLORIDA RICO (Sections 772.103 & 895.03, Florida Statutes)
### (Against School Warehouse)

308. Plaintiffs incorporate by reference paragraphs 1 through 196 of this Complaint as if set forth in full.

309. School Warehouse is a member of the May Enterprise, an "association-in-fact" enterprise under sections 772.102(3) and 895.02(3), Florida Statutes. School Warehouse agreed to and did conduct and participate in the conduct of the May Enterprise's affairs through a pattern of racketeering activity in furtherance of the May Enterprise Scheme.

310. School Warehouse engaged in at least two predicate acts within a ten-year period that constitute a pattern of "racketeering activities" under the Florida Civil Remedies for Criminal Practices Act, section 772.102, Florida Statutes, and Florida RICO, section 895.02, Florida Statutes. These racketeering activities were aimed at intentionally defrauding the Plaintiffs of substantial sums of money, enriching the RICO Defendants and others that may yet be unidentified, and concealing these activities. Specific predicate acts that School Warehouse engaged in include, but are not limited to, the following:

a. In violation of section 817.034, Florida Statutes, School Warehouse, at the direction of Kunkemoeller, mailed the Plaintiffs fraudulent invoices that included items substantially marked up above costs as part of the Fraudulent Invoicing Scheme, including, but not limited to, those fraudulent invoices

detailed in Paragraphs 74 through 99.

    b.   In violation of section 896.101, Florida Statutes, School Warehouse conducted or participated in financial transactions designed to disguise the nature, location, source, ownership, or control of proceeds from the Fraudulent Invoicing Scheme, including, but not limited to, those financial transactions identified in Paragraphs 69 through 99; 128 through 131; and 146 through 172.

311.    School Warehouse unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate sections 772.103(3) and 895.03(3), Florida Statutes, as described above, in violation of sections 772.103(4) and 895.03(4), Florida Statutes.

312.    Upon information and belief, School Warehouse knew that it was engaged in a conspiracy to commit the predicate acts, and knew that the predicate acts were part of such racketeering activity, and its participation in each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate sections 772.103(3) and 895.03(3), Florida Statutes, in violation of sections 772.103(4) and 895.03(4), Florida Statutes.

313.    As a direct and proximate result of School Warehouse's conspiracy, the overt acts taken in furtherance of that conspiracy, and the racketeering activities in violation of sections 772.103(3) and 895.03(3), Florida Statutes, Plaintiffs have been injured in their business and property.

314.    Pursuant to section 772.104(1), Plaintiffs are entitled to treble damages plus costs and attorneys' fees from School Warehouse.

315.    Pursuant to sections 895.05(1) and (6), Florida Statutes, Plaintiffs are entitled to an injunction preventing School Warehouse from committing further violations of section 895.03, Florida Statutes.

WHEREFORE, Plaintiffs demand judgment against School Warehouse and relief as follows:

a) An order that School Warehouse, its officers, agents, employees, and any persons in active concert or participation with them be restrained and enjoined from directly or indirectly transferring, selling, alienating, liquidating, converting, withdrawing, or otherwise disposing of any money or other of School Warehouse's assets;

b) Damages, trebled according to section 772.104, Florida Statutes for which all RICO Defendants are jointly and severally liable;

c) Entry of an injunction preventing School Warehouse from committing further violations of section 895.03, Florida Statutes;

d) A finding of alter ego liability between School Warehouse and its controlled entities;

e) Pre-judgment interest;

f) Plaintiffs' reasonable attorneys' fees and costs according to section 772.104, Florida Statutes;

g) An accounting of School Warehouse's assets; and

h) Imposition of an equitable lien and constructive trust.

## COUNT XVII: FLORIDA RICO (Sections 772.103 & 895.03, Florida Statutes)
### (Against Newpoint Education Partners)

316.     Plaintiffs incorporate by reference paragraphs 1 through 196 of this Complaint as if set forth in full.

317.     Newpoint Education Partners is a member of the May Enterprise, an "association-in-fact" enterprise under sections 772.102(3) and 895.02(3), Florida Statutes. Newpoint Education Partners agreed to and did conduct and participate in the conduct of the May Enterprise's affairs through a pattern of racketeering activity in furtherance of the May Enterprise Scheme.

318.     Newpoint Education Partners engaged in at least two predicate acts within a ten-year period that constitute a pattern of "racketeering activities" under the Florida Civil Remedies for Criminal Practices Act, section 772.102, Florida Statutes, and Florida RICO, section 895.02, Florida Statutes.   These racketeering activities were aimed at intentionally defrauding the Plaintiffs of substantial sums of money, enriching the RICO Defendants and others that may yet be unidentified, and concealing these activities.   Specific predicate acts that Newpoint Education Partners engaged in include, but are not limited to, the following:

      a.   In violation of section 817.034, Florida Statutes, Newpoint Education Partners engaged in various email communications with Apex Learning, wherein Newpoint Education Partners devised a scheme or artifice to defraud the Plaintiffs of substantial sums of money through the Fraudulent Apex Rebate Scheme and negotiated with Apex Learning the terms of the scheme or artifice, including, but not limited to, those communications described in Paragraphs 69 through 99 and 111 through 127.

b. In violation of section 896.101, Florida Statutes, Newpoint Education Partners conducted or participated in financial transactions through wire of proceeds from the Fraudulent Invoice Scheme, including, but not limited to those financial transactions described in Paragraphs 69 through 99; 128 through 131; and 146 through 172.

319. Newpoint Education Partners unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate sections 772.103(3) and 895.03(3), Florida Statutes, as described above, in violation of sections 772.103(4) and 895.03(4), Florida Statutes.

320. Upon information and belief, Newpoint Education Partners knew that it was engaged in a conspiracy to commit the predicate acts, and knew that the predicate acts were part of such racketeering activity, and its participation in each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate sections 772.103(3) and 895.03(3), Florida Statutes, in violation of sections 772.103(4) and 895.03(4), Florida Statutes.

321. As a direct and proximate result of Newpoint Education Partners' conspiracy, the overt acts taken in furtherance of that conspiracy, and the racketeering activities in violation of sections 772.103(3) and 895.03(3), Florida Statutes, Plaintiffs have been injured in their business and property.

322. Pursuant to section 772.104(1), Plaintiffs are entitled to treble damages plus costs and attorneys' fees from Newpoint Education Partners.

323. Pursuant to sections 895.05(1) and (6), Florida Statutes, Plaintiffs are entitled to an injunction preventing Newpoint Education Partners from committing further violations

of section 895.03, Florida Statutes.

WHEREFORE, Plaintiffs demand judgment against Newpoint Education Partners and relief as follows:

a) An order that Newpoint Education Partners, its officers, agents, employees, and any persons in active concert or participation with them be restrained and enjoined from directly or indirectly transferring, selling, alienating, liquidating, converting, withdrawing, or otherwise disposing of any money or other of Newpoint Education Partners' assets;

b) Damages, trebled according to section 772.104, Florida Statutes for which all RICO Defendants are jointly and severally liable;

c) A finding of alter ego liability between Newpoint Education Partners and its controlled entities;

d) Entry of an injunction preventing Newpoint Education Partners from committing further violations of section 895.03, Florida Statutes;

e) Pre-judgment interest;

f) Plaintiffs' reasonable attorneys' fees and costs according to section 772.104, Florida Statutes;

g) An accounting of Newpoint Education Partners' assets; and

h) Imposition of an equitable lien and constructive trust.

## COUNT XVIII: FLORIDA RICO (Sections 772.103 & 895.03, Florida Statutes)
### (Against Cambridge Education Group)

324.     Plaintiffs incorporate by reference paragraphs 1 through 196 of this Complaint as if set forth in full.

325.     Cambridge Education Group is a member of the May Enterprise, an "association-in-fact" enterprise under sections 772.102(3) and 895.02(3), Florida Statutes. Cambridge Education Group agreed to and did conduct and participate in the conduct of the May Enterprise's affairs through a pattern of racketeering activity in furtherance of the May Enterprise Scheme.

326.     Cambridge Education Group engaged in at least two predicate acts within a ten-year period that constitute a pattern of "racketeering activities" under the Florida Civil Remedies for Criminal Practices Act, section 772.102, Florida Statutes, and Florida RICO, section 895.02, Florida Statutes.  These racketeering activities were aimed at intentionally defrauding the Plaintiffs of substantial sums of money, enriching the RICO Defendants and others that may yet be unidentified, and concealing these activities.  Specific predicate acts that Cambridge Education Group engaged in include, but are not limited to, the following:

    a.   In violation of section 817.034, Florida Statutes, May, on behalf of Cambridge Education Group, engaged in various email communications with Apex Learning, where he devised a scheme or artifice to defraud the Plaintiffs of substantial sums of money through the Fraudulent Apex Rebate Scheme and negotiated with Apex Learning the terms of the scheme or artifice, including, but not limited to, those communications described in Paragraphs 19; 53; 76; 69 through 99 and Paragraphs 111 through 127.

b.  In violation of section 817.034, Florida Statutes, May, on behalf of Cambridge Education Group, directed Apex Learning to transmit to Rearden Capital fraudulent kickbacks disguised as "rebates" derived from the Fraudulent Apex Rebate Scheme through wire or other means, as described in Paragraphs 179 through 183.

c.  In violation of section 896.101, Florida Statutes, Cambridge Education Group conducted or participated in financial transactions designed to disguise the nature, location, source, ownership, or control of proceeds derived from the Fraudulent Invoicing Scheme and other component schemes of the May Enterprise Scheme, including, but not limited to, those financial transactions identified in Paragraphs 69 through 99; 128 through 131; and 146 through 172.

327.    Cambridge Education Group unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate sections 772.103(3) and 895.03(3), Florida Statutes, as described above, in violation of sections 772.103(4) and 895.03(4), Florida Statutes.

328.    Upon information and belief, Cambridge Education Group knew that it was engaged in a conspiracy to commit the predicate acts, and knew that the predicate acts were part of such racketeering activity, and its participation in each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate sections 772.103(3) and 895.03(3), Florida Statutes, in violation of sections 772.103(4) and 895.03(4), Florida Statutes.

329.    As a direct and proximate result of Cambridge Education Group's conspiracy, the overt acts taken in furtherance of that conspiracy, and the racketeering activities in violation

of sections 772.103(3) and 895.03(3), Florida Statutes, Plaintiffs have been injured in their business and property.

330.     Pursuant to section 772.104(1), Plaintiffs are entitled to treble damages plus costs and attorneys' fees from Cambridge Education Group.

331.     Pursuant to sections 895.05(1), 895.05(6), Florida Statutes, Plaintiffs are entitled to an injunction preventing Cambridge Education Group from committing further violations of section 895.03, Florida Statutes.

WHEREFORE, Plaintiffs demand judgment against Cambridge Education Group and relief as follows:

a) An order that Cambridge Education Group, its officers, agents, employees, and any persons in active concert or participation with them be restrained and enjoined from directly or indirectly transferring, selling, alienating, liquidating, converting, withdrawing, or otherwise disposing of any money or other of Cambridge Education Group's assets;

b) Damages, trebled according to section 772.104, Florida Statutes for which all RICO Defendants are jointly and severally liable;

c) Entry of an injunction preventing Cambridge Education Group from committing further violations of section 895.03, Florida Statutes;

d) A finding of alter ego liability between Cambridge Education Group and its controlled entities;

e) Pre-judgment interest;

f) Plaintiffs' reasonable attorneys' fees and costs according to section 772.104, Florida Statutes;

g)  An accounting of Cambridge Education Group's assets; and

h)  Imposition of an equitable lien and constructive trust.

## COUNT XIX: FLORIDA RICO (Sections 772.103 & 895.03, Florida Statutes)
### (Against Solo Products)

332.  Plaintiffs incorporate by reference paragraphs 1 through 196 of this Complaint as if set forth in full.

333.  Solo Products is a member of the May Enterprise, an "association-in-fact" enterprise under sections 772.102(3) and 895.02(3), Florida Statutes.  Solo Products agreed to and did conduct and participate in the conduct of the May Enterprise's affairs through a pattern of racketeering activity in furtherance of the May Enterprise Scheme.

334.  Solo Products engaged in at least two predicate acts within a ten-year period that constitute a pattern of "racketeering activities" under the Florida Civil Remedies for Criminal Practices Act, section 772.102, Florida Statutes, and Florida RICO, section 895.02, Florida Statutes.  These racketeering activities were aimed at intentionally defrauding the Plaintiffs of substantial sums of money, enriching the RICO Defendants and others that may yet be unidentified, and concealing these activities.  Specific predicate acts that Solo Products engaged in include, but are not limited to, the following:

a.  In violation of section 896.101, Florida Statutes, Solo Products conducted or participated in financial transactions designed to disguise the nature, location, source, ownership, or control of proceeds from the Fraudulent Invoicing Scheme, including, but not limited to, those financial transactions identified in Paragraphs 69 through 99; 128 through 131; and 146 through 172.

335.  Solo Products unlawfully, knowingly, and willfully combined, conspired,

confederated, and agreed together and with others to violate sections 772.103(3) and 895.03(3),

Florida Statutes, as described above, in violation of sections 772.103(4) and 895.03(4), Florida

Statutes.

336.    Upon information and belief, Solo Products knew that it was engaged in a

conspiracy to commit the predicate acts, and knew that the predicate acts were part of such

racketeering activity, and its participation in each of them was necessary to allow the

commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to

violate sections 772.103(3) and 895.03(3), Florida Statutes, in violation of sections 772.103(4)

and 895.03(4), Florida Statutes.

337.    As a direct and proximate result of Solo Products' conspiracy, the overt acts

taken in furtherance of that conspiracy, and the racketeering activities in violation of sections

772.103(3) and 895.03(3), Florida Statutes, Plaintiffs have been injured in their business and

property.

338.    Pursuant to section 772.104(1), Plaintiffs are entitled to treble damages plus

costs and attorneys' fees from Solo Products.

339.    Pursuant to sections 895.05(1), 895.05(6), Florida Statutes, Plaintiffs are

entitled to an injunction preventing Solo Products from committing further violations of section

895.03, Florida Statutes.

WHEREFORE, Plaintiffs demand judgment against Solo Products and relief as

follows:

  a) An order that Solo Products, its officers, agents, employees, and any persons

     in active concert or participation with them be restrained and enjoined from

     directly or indirectly transferring, selling, alienating, liquidating, converting,

withdrawing, or otherwise disposing of any money or other of Solo Products' assets;

b) Damages, trebled according to section 772.104, Florida Statutes for which all RICO Defendants are jointly and severally liable;

c) Entry of an injunction preventing Solo Products from committing further violations of section 895.03, Florida Statutes;

d) A finding of alter ego liability between Solo Products and its controlled entities;

e) Pre-judgment interest;

f) Plaintiffs' reasonable attorneys' fees and costs according to section 772.104, Florida Statutes;

g) An accounting of Solo Products' assets; and

h) Imposition of an equitable lien and constructive trust.

## COUNT XX: FLORIDA RICO (Sections 772.103 & 895.03, Florida Statutes)
### (Against Direct Store Delivery)

340. Plaintiffs incorporate by reference paragraphs 1 through 196 of this Complaint as if set forth in full.

341. Direct Store Delivery is a member of the May Enterprise, an "association-in-fact" enterprise under sections 772.102(3) and 895.02(3), Florida Statutes. Direct Store Delivery agreed to and did conduct and participate in the conduct of the May Enterprise's affairs through a pattern of racketeering activity in furtherance of the May Enterprise Scheme.

342. Direct Store Delivery engaged in at least two predicate acts within a ten-year period that constitute a pattern of "racketeering activities" under the Florida Civil Remedies

110

for Criminal Practices Act, section 772.102, Florida Statutes, and Florida RICO, section 895.02, Florida Statutes. These racketeering activities were aimed at intentionally defrauding the Plaintiffs of substantial sums of money, enriching the RICO Defendants and others that may yet be unidentified, and concealing these activities. Specific predicate acts that Direct Store Delivery engaged in include, but are not limited to, the following:

     a.  In violation of section 896.101, Florida Statutes, Direct Store Delivery conducted or participated in financial transactions designed to disguise the nature, location, source, ownership, or control of proceeds from the Fraudulent Invoicing Scheme, including, but not limited to, those financial transactions identified in Paragraphs 69 through 99; 128 through 131; and 146 through 172.

343.    Direct Store Delivery unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate sections 772.103(3) and 895.03(3), Florida Statutes, as described above, in violation of sections 772.103(4) and 895.03(4), Florida Statutes.

344.    Upon information and belief, Direct Store Delivery knew that it was engaged in a conspiracy to commit the predicate acts, and knew that the predicate acts were part of such racketeering activity, and its participation in each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate sections 772.103(3) and 895.03(3), Florida Statutes, in violation of sections 772.103(4) and 895.03(4), Florida Statutes.

345.    As a direct and proximate result of Direct Store Delivery's conspiracy, the overt acts taken in furtherance of that conspiracy, and the racketeering activities in violation of sections 772.103(3) and 895.03(3), Florida Statutes, Plaintiffs have been injured in their

business and property.

346.    Pursuant to section 772.104(1), Plaintiffs are entitled to treble damages plus costs and attorneys' fees from Direct Store Delivery.

347.    Pursuant to sections 895.05(1), 895.05(6), Florida Statutes, Plaintiffs are entitled to an injunction preventing Direct Store Delivery from committing further violations of section 895.03, Florida Statutes.

WHEREFORE, Plaintiffs demand judgment against Direct Store Delivery and relief as follows:

   a) An order that Direct Store Delivery, its officers, agents, employees, and any persons in active concert or participation with them be restrained and enjoined from directly or indirectly transferring, selling, alienating, liquidating, converting, withdrawing, or otherwise disposing of any money or other of Direct Store Delivery's assets;

   b) Damages, trebled according to section 772.104, Florida Statutes for which all RICO Defendants are jointly and severally liable;

   c) Entry of an injunction preventing Direct Store Delivery from committing further violations of section 895.03, Florida Statutes;

   d) A finding of alter ego liability between Direct Store Delivery and its controlled entities;

   e) Pre-judgment interest;

   f) Plaintiffs' reasonable attorneys' fees and costs according to section 772.104, Florida Statutes;

   g) An accounting of Direct Store Delivery's assets; and

h)  Imposition of an equitable lien and constructive trust.

## COUNT XXI: FLORIDA RICO (Sections 772.103 & 895.03, Florida Statutes)
### (Against Red Ignition, LLC)

348.    Plaintiffs incorporate by reference paragraphs 1 through 196 of this Complaint as if set forth in full.

349.    Red Ignition, LLC is a member of the May Enterprise, an "association-in-fact" enterprise under sections 772.102(3) and 895.02(3), Florida Statutes.  Red Ignition, LLC agreed to and did conduct and participate in the conduct of the May Enterprise's affairs through a pattern of racketeering activity in furtherance of the May Enterprise Scheme.

350.    Red Ignition, LLC engaged in at least two predicate acts within a ten-year period that constitute a pattern of "racketeering activities" under the Florida Civil Remedies for Criminal Practices Act, section 772.102, Florida Statutes, and Florida RICO, section 895.02, Florida Statutes.  These racketeering activities were aimed at intentionally defrauding the Plaintiffs of substantial sums of money, enriching the RICO Defendants and others that may yet be unidentified, and concealing these activities.  Specific predicate acts that Red Ignition, LLC engaged in include, but are not limited to, the following:

a.  In violation of section 817.034, Florida Statutes, Red Ignition, LLC, at the direction of May, mailed Palm Bay Education fraudulent invoices that included items substantially marked up above costs as part of the Fraudulent Invoicing Scheme, including, but not limited to, those fraudulent invoices detailed in Paragraphs 59; 75; 69 through 99; and 105 through 106.

b.  In violation of section 817.034, Florida Statutes, Red Ignition, LLC, at the direction of May, mailed Palm Bay Education fraudulent invoices that included

items substantially marked up above costs as part of the Fraudulent Invoicing Scheme, including, but not limited to, those fraudulent invoices detailed in Paragraphs 69 through 99; 128 through 131; 146 through 172; and 185.

351.     Red Ignition, LLC unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate sections 772.103(3) and 895.03(3), Florida Statutes, as described above, in violation of sections 772.103(4) and 895.03(4), Florida Statutes.

352.     Upon information and belief, Red Ignition, LLC knew that it was engaged in a conspiracy to commit the predicate acts, and knew that the predicate acts were part of such racketeering activity, and its participation in each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate sections 772.103(3) and 895.03(3), Florida Statutes, in violation of sections 772.103(4) and 895.03(4), Florida Statutes.

353.     As a direct and proximate result of Red Ignition, LLC's conspiracy, the overt acts taken in furtherance of that conspiracy, and the racketeering activities in violation of sections 772.103(3) and 895.03(3), Florida Statutes, Plaintiffs have been injured in their business and property.

354.     Pursuant to section 772.104(1), Plaintiffs are entitled to treble damages plus costs and attorneys' fees from Red Ignition, LLC.

355.     Pursuant to sections 895.05(1), 895.05(6), Florida Statutes, Plaintiffs are entitled to an injunction preventing Red Ignition, LLC from committing further violations of section 895.03, Florida Statutes.

WHEREFORE, Plaintiffs demand judgment against Red Ignition, LLC and relief as follows:

a)  An order that Red Ignition, LLC, its officers, agents, employees, and any persons in active concert or participation with them be restrained and enjoined from directly or indirectly transferring, selling, alienating, liquidating, converting, withdrawing, or otherwise disposing of any money or other of Red Ignition, LLC's assets;

b)  Damages, trebled according to section 772.104, Florida Statutes for which all RICO Defendants are jointly and severally liable;

c)  Entry of an injunction preventing Red Ignition, LLC from committing further violations of section 895.03, Florida Statutes;

d)  A finding of alter ego liability between Red Ignition, LLC, and its controlled entities;

e)  Pre-judgment interest;

f)  Plaintiffs' reasonable attorneys' fees and costs according to section 772.104, Florida Statutes;

g)  An accounting of Red Ignition, LLC's assets; and

h)  Imposition of an equitable lien and constructive trust.

## COUNT XXII: FLORIDA RICO (Sections 772.103 & 895.03, Florida Statutes)
### (Against Rearden Capital)

356.    Plaintiffs incorporate by reference paragraphs 1 through 196 of this Complaint as if set forth in full.

357.    Rearden Capital is a member of the May Enterprise, an "association-in-fact"

enterprise under sections 772.102(3) and 895.02(3), Florida Statutes.  Rearden Capital agreed to and did conduct and participate in the conduct of the May Enterprise's affairs through a pattern of racketeering activity in furtherance of the May Enterprise Scheme.

358.    Rearden Capital engaged in at least two predicate acts within a ten-year period that constitute a pattern of "racketeering activities" under the Florida Civil Remedies for Criminal Practices Act, section 772.102, Florida Statutes, and Florida RICO, section 895.02, Florida Statutes.  These racketeering activities were aimed at intentionally defrauding the Plaintiffs of substantial sums of money, enriching the RICO Defendants and others that may yet be unidentified, and concealing these activities.  Specific predicate acts that Rearden Capital engaged in include, but are not limited to, the following:

    a.  In violation of section 896.101, Florida Statutes, Rearden Capital conducted or participated in financial transactions designed to disguise the nature, location, source, ownership, or control of proceeds from the Fraudulent Invoicing Scheme, including, but not limited to, those financial transactions identified in Paragraphs 69 through 99; 128 through 131; 146 through 172; and 185.

359.    Rearden Capital unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate sections 772.103(3) and 895.03(3), Florida Statutes, as described above, in violation of sections 772.103(4) and 895.03(4), Florida Statutes.

360.    Upon information and belief, Rearden Capital knew that it was engaged in a conspiracy to commit the predicate acts, and knew that the predicate acts were part of such racketeering activity, and its participation in each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to

violate sections 772.103(3) and 895.03(3), Florida Statutes, in violation of sections 772.103(4) and 895.03(4), Florida Statutes.

361.    As a direct and proximate result of Rearden Capital's conspiracy, the overt acts taken in furtherance of that conspiracy, and the racketeering activities in violation of sections 772.103(3) and 895.03(3), Florida Statutes, Plaintiffs have been injured in their business and property.

362.    Pursuant to section 772.104(1), Plaintiffs are entitled to treble damages plus costs and attorneys' fees from Rearden Capital.

363.    Pursuant to sections 895.05(1), 895.05(6), Florida Statutes, Plaintiffs are entitled to an injunction preventing Rearden Capital from committing further violations of section 895.03, Florida Statutes.

WHEREFORE, Plaintiffs demand judgment against Rearden Capital and relief as follows:

a) An order that Rearden Capital, its officers, agents, employees, and any persons in active concert or participation with them be restrained and enjoined from directly or indirectly transferring, selling, alienating, liquidating, converting, withdrawing, or otherwise disposing of any money or other of Rearden Capital's assets;

b) Damages, trebled according to section 772.104, Florida Statutes for which all RICO Defendants are jointly and severally liable;

c) Entry of an injunction preventing Rearden Capital from committing further violations of section 895.03, Florida Statutes;

d) A finding of alter ego liability between Rearden Capital and its controlled

entities;

e)   Pre-judgment interest;

f)   Plaintiffs' reasonable attorneys' fees and costs according to section 772.104,

Florida Statutes;

g)   An accounting of Rearden Capital's assets; and

h)   Imposition of an equitable lien and constructive trust.

## COUNT XXIII: UNJUST ENRICHMENT
### (Against May, Kunkemoeller, Mary May, School Warehouse,
### Solo Products, Direct Store Delivery, Newpoint Education Partners,
### Cambridge Education Group, and Affiliate Defendants)

364.   Plaintiffs incorporate by reference paragraphs 1 through 196 of this Complaint

as if set forth in full.

365.   Under Florida law, a plaintiff is entitled to restitution where the defendant was

unjustly enriched at the expense of the plaintiff.  *Gonzalez v. Eagle Ins. Co.*, 948 So. 2d 1, 3

(Fla. 3d DCA 2006).   The elements of a cause of action for unjust enrichment are: 1.) the

plaintiff has conferred a benefit on the defendant, who has knowledge thereof; 2.) the defendant

voluntarily accepted and retained the benefit conferred; and 3.) the circumstances are such that

it would be inequitable for the defendant to retain the benefit without paying the value thereof

to the plaintiff.  *Hillman Construction Corp. v. Wainer*, 636 So. 2d 576, 577 (Fla. 4th DCA

1994).

366.   In billing the Plaintiffs for furniture and equipment based upon fraudulent

invoices, Defendants May, Kunkemoeller, Mary May, School Warehouse, Solo Products,

Direct Store Delivery, Newpoint Education Partners, Cambridge Education Group, and

Affiliate Defendants (collectively referred to herein, as the "***Count XXI Defendants***") received

a benefit from Plaintiffs through improper and unlawful means by way of the Fraudulent Invoicing Scheme.

367.   The Count XXI Defendants knew or should have known this benefit was conferred upon them.

368.   The circumstances are such that it would be inequitable for the Count XXI Defendants to retain these funds or the real property acquired by these funds.  Equity and good conscience demand that the Defendants pay restitution to the Plaintiffs and that an equitable lien and/or constructive trust be imposed on the proceeds of the May Enterprise Scheme.

WHEREFORE, Plaintiffs demand judgment against the Count XXI Defendants for restitution, equitable lien, constructive trust, Plaintiffs' reasonable attorneys' fees, costs, and any other relief this Court may deem just and appropriate.

## COUNT XXIV: FRAUDULENT MISREPRESENTATION, ARTIFICE, OR SCHEME
### (Against May, Mary May, Steven Kunkemoeller, Susan M. Kunkemoeller, School Warehouse, Red Ignition, LLC, and Newpoint Education Partners)

369.   Plaintiffs incorporate by reference paragraphs 1 through 196 of this Complaint as if set forth in full.

370.   Under Florida law, a claim of fraudulent misrepresentation includes the following elements: 1) a false statement concerning a material fact; 2) the representor's knowledge that the representation is false; 3) an intention that the representation induce another to act on it; and 4) consequent injury by the party acting in reliance on the representation. *Fuller v. Mortgage Electronic Registration Systems, Inc.*, 888 F. Supp. 2d 1257, 1276 (M.D. Fla. 2012).

### *Marcus May*

371.      May acted as an agent and fiduciary of each of the Plaintiffs, by way of those certain Management Agreements each Plaintiff entered into with Newpoint Education Partners. May took advantage of the authority granted to him by way of the Plaintiff's Management Agreements with Newpoint Education Partners in order to enrich himself.

372.      Rather than making fiscal decisions for the Plaintiffs that were in their best interest, May induced Plaintiffs to purchase furniture, equipment, supplies, and services from companies in which he had a direct or indirect interest.  May would directly or indirectly receive illegal kickbacks once the schools purchased goods or services from one of these related companies.

373.      May concealed the nature of his relationship with each of these business entities.

374.      May created or directed others to create fraudulent invoices to send to the Plaintiffs with prices for the furniture, equipment, supplies, and services marked well above market value.

375.      The Plaintiffs acted on May's representations and purchased furniture, equipment, supplies, and services from the suppliers he recommended.

376.      Plaintiffs were injured by way of May's fraudulent misrepresentations.

377.      The Plaintiffs suffered injuries, in that they paid for the furniture, equipment, supplies, and services from the suppliers at prices well in excess of market value.

### *Steven Kunkemoeller*

378.      Kunkemoeller worked in conjunction with May to devise and perpetrate the Fraudulent Invoicing Scheme described in Paragraphs 69 through 99.

379.      Kunkemoeller formed School Warehouse as a shell company to perpetrate the

Fraudulent Invoicing Scheme.

380.     At the direction of May, the Plaintiffs would place an order with School Warehouse to purchase furniture, equipment, and supplies.  School Warehouse would then purchase the furniture, equipment, and supplies from a real vendor, create a fraudulent invoice with prices marked far above market value, and then bill the Plaintiffs based on the fraudulent invoice.

381.     The Plaintiffs relied on the fraudulent invoices by paying the amounts represented thereon.

382.     Kunkemoeller had an arrangement with May, whereby May would receive approximately half of the profits from School Warehouse's racketeering activities.

383.     Kunkemoeller never disclosed to the Plaintiffs the nature of his relationship with May or that of School Warehouse and worked to conceal this relationship.

384.     The Plaintiffs suffered injuries, in that they paid for the furniture, equipment, supplies, and services from the suppliers at prices well in excess of market value.

### *Mary May*

385.     Mary May played a key role in the May Enterprise by creating shell companies that directly participated in the May Enterprise Scheme.

386.     In an effort to conceal and impede the ability of victims of the May Enterprise Scheme to recover funds from which they were defrauded, Mary May and May agreed to a sham divorce, whereupon Mary May ended up with millions of dollars in ill-gotten cash and other property.

387.     Plaintiffs were injured by the actions of Mary May.

388.     The Plaintiffs suffered injuries, in that they paid for the furniture, equipment,

supplies, and services from the suppliers at prices well in excess of market value.

### Susan M. Kunkemoeller

389.    Susan Kunkemoeller played a key role in the May Enterprise by directly participated in the May Enterprise Scheme.

390.    In an effort to conceal and impede the ability of victims of the May Enterprise Scheme to recover funds from which they were defrauded, Susan Kunkemoeller materially assisted in, *inter alia*, the Money Laundering Scheme and the Real Estate Acquisition Scheme.

391.    Plaintiffs were injured by the actions of Susan Kunkemoeller.

### Newpoint Education Partners

392.    In each Management Contract, Defendant Newpoint Education Partners represented to the Plaintiffs that Newpoint Education Partners would seek "manufacturers and equipment that can assist the School to achieve its mission, educational goals and performance objectives." **Exhs. 3, 4, and 5**.  Newpoint Education Partners further represented it would identify possible alternative suppliers and perform due diligence regarding terms, conditions, and pricing.  *Id.*

393.    Defendants Newpoint Education Partners, School Warehouse, Red Ignition, LLC, May, and Kunkemoeller never revealed to the Plaintiffs the relationships that existed between them and worked to conceal this fact.

394.    Defendant Newpoint Education Partners did not in fact explore alternative manufacturers or conduct due diligence when purchasing furniture and equipment, but purchased from Red Ignition, LLC or School Warehouse at prices well in excess of the amount the furniture and equipment actually cost.

395.    Defendants Newpoint Education Partners, School Warehouse, Red Ignition,

LLC, May, and Kunkemoeller made these misrepresentations to the Plaintiffs in order to induce the Plaintiffs into purchasing furniture and equipment from the suppliers recommended by Newpoint Education Partners, which were in fact conduit business entities that were a part of the May Enterprise.

### *Red Ignition, LLC*

396.    Red Ignition, LLC was a shell company that May created to perpetrate the Fraudulent Invoicing Scheme.

397.    May acted as an agent and fiduciary of each of the Plaintiffs, by way of those certain Management Agreements each Plaintiff entered into with Newpoint Education Partners. May took advantage of the authority granted to him by way of the Plaintiff's Management Agreements with Newpoint Education Partners in order to enrich himself.

398.    As described in Paragraphs 69 through 99, May would induce the Plaintiffs to purchase furniture, equipment, and supplies from Red Ignition, LLC, which he directed and controlled.  May never disclosed to the Plaintiffs his relationship with Red Ignition, LLC and made efforts to conceal this fact.

399.    The Plaintiffs would place an order for furniture, equipment, or supplies with Red Ignition, LLC.  May would then order the furniture, equipment, or supplies from a real vendor, create a fraudulent invoice with prices marked far above market value, and then bill the Plaintiffs based on the fraudulent invoice.

400.    The Plaintiffs relied on the fraudulent invoices by paying the amounts represented thereon.

401.    The Plaintiffs suffered injuries, in that they paid for the furniture, equipment, supplies, and services from the suppliers at prices well in excess of market value.

*School Warehouse*

402.     School Warehouse was a shell company that Kunkemoeller created to perpetrate the Fraudulent Invoicing Scheme.

403.     Kunkemoeller had an arrangement with May, whereby May would receive approximately half of the profits from School Warehouse's racketeering activities

404.     As described in Paragraphs 69 through 99, May would induce the Plaintiffs to purchase furniture, equipment, and supplies from School Warehouse.   Neither May nor Kunkemoeller ever disclosed to the Plaintiffs their relationship and made efforts to conceal this fact.

405.     The Plaintiffs would place an order for furniture, equipment, or supplies with School Warehouse.   School Warehouse, at the direction of Kunkemoeller, would then order the furniture, equipment, or supplies from a real vendor, create a fraudulent invoice with prices marked far above market value, and then bill the Plaintiffs based on the fraudulent invoice.

406.     The Plaintiffs relied on the fraudulent invoices by paying the amounts represented thereon.

407.     The Plaintiffs suffered injuries, in that they paid for the furniture, equipment, supplies, and services from the suppliers at prices well in excess of market value

*Damages*

408.     The Plaintiffs suffered damages as a direct result of the misrepresentations that were made by Defendants Newpoint Education Partners, School Warehouse, Red Ignition, LLC, May, Mary May, Kunkemoeller, and Susan Kunkemoeller.

409.     The Plaintiffs are thereby entitled to an award of damages.

WHEREFORE, Plaintiffs demand judgment against Defendants Newpoint Education Partners, School Warehouse, Red Ignition, LLC, May, Mary May, Kunkemoeller, and Susan Kunkemoeller for damages, punitive damages, Plaintiffs' reasonable attorneys' fees, costs, and any other relief this Court may deem just and appropriate.

## COUNT XXV: BREACH OF CONTRACT
### (Against Newpoint Education Partners)

410.    Plaintiffs incorporate by this reference paragraphs 1 through 196 as if fully set forth herein.

411.    Each of the Plaintiffs entered into a Management Agreement with Newpoint Education Partners.

412.    In each Management Agreement, Defendant Newpoint Education Partners represented to the Plaintiffs that Newpoint Education Partners would seek "manufacturers and equipment that can assist the School to achieve its mission, educational goals and performance objectives." *See* **Exhs. 3, 4, and 5.**  Newpoint Education Partners further represented it would identify possible alternative suppliers and perform due diligence regarding terms, conditions, and pricing. *Id*.

413.    Newpoint Education Partners breached each Management Agreement by purchasing furniture and equipment from entities, such as School Warehouse and Red Ignition, LLC, that were directly related to May and Kunkemoeller.  Newpoint Education Partners did not perform due diligence regarding terms, conditions, and pricing of furniture and equipment, but rather perpetrated a fraud against the Plaintiffs in order to divest them of substantial sums of money and enrich May, Kunkemoeller, and other defendants in this case.

414.     The Plaintiffs have each been damaged by Newpoint Education Partners breach of the Management Agreements.

WHEREFORE, Plaintiffs demand judgment against Defendants Newpoint Education for damages, Plaintiffs' reasonable attorneys' fees, costs, and any other relief this Court may deem just and appropriate.

Respectfully submitted this 7th day of June, 2019.

THE ARNOLD LAW FIRM, L.L.C.

By: /s/ Shawn A. Arnold
Shawn A. Arnold, Esq., B.C.S.
Florida Bar No.: 0193232
Melissa Gross-Arnold, Esq., B.C.S.
Fl. Bar No.: 0194300
6279 Dupont Station Court
Jacksonville, FL 32217
(904) 731-3800 (main)
(904) 731-3807 (facsimile)
sarnold@arnoldlawfirmllc.com
melissa@arnoldlawfirmllc.com

and

THE EIDSON LAW FIRM, P.A.

By: /s/ James C. Eidson
James C. Eidson, Esq.
Florida Bar No.: 0047695
THE EIDSON LAW FIRM, P.A.
6279 Dupont Station Court Jacksonville,
FL 32217
Telephone: (904) 990-8080
james@eidsonlawfirm.com

*Attorneys for Plaintiffs*

126